**Ernest John DOBBERT, Jr., Petitioner,**

v.

**Louie L. WAINWRIGHT, Secretary, Department of Corrections of the State of Florida; and R.L. Dugger, Superintendent of Florida State Prison, Respondents.**

No. 84–1013–Civ–J–14.

United States District Court,
M.D. Florida,
Jacksonville Division.

Sept. 3, 1984.

Patrick D. Doherty, Clearwater, Fla., Steven H. Malone, St. Petersburg, Fla., for petitioner.

Carolyn Snurkowski, Asst. Atty. Gen., Miami, Fla., for respondents.

## OPINION

SUSAN H. BLACK, District Judge.

### SECTION ONE: HISTORY

Petitioner was tried in the Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida on an amended four-count indictment charging petitioner with first degree murder (two counts) and child torture (two counts). Jury selection commenced March 18, 1974. On March 29, 1974, the jury returned a verdict finding the petitioner guilty of murder in the first degree, murder in the second degree, child abuse and child torture. The trial court on April 12, 1974, sentenced the petitioner to death.

On April 25, 1974, a Notice of Appeal was filed in the Florida Supreme Court, which court on January 14, 1976, affirmed the April 12, 1974, judgment and sentence of the trial court.

Certiorari was taken to the United States Supreme Court and that Court affirmed the lower courts on June 17, 1977. An application for relief to the Florida Supreme Court was made by petitioner pursuant to *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), and on March 31, 1978, the Florida Supreme Court directed the trial court to set aside the death sentence and afford the petitioner an opportunity to respond to the Presentence Investigation Report before resentencing.

The trial court set aside the sentence on May 4, 1978. The petitioner responded to the Presentence Investigation Report on May 30, 1978, and thereafter requested a plenary sentencing hearing. The trial court granted the motion, and a plenary

sentencing hearing was held on June 22, 1978. On June 30, 1978, the trial court sentenced petitioner to death and on June 30, 1978, a Notice of Appeal was filed in the Florida Supreme Court. The Florida Supreme Court affirmed the sentence on July 5, 1979.

On January 6, 1982, the Governor of the State of Florida signed a warrant for execution (hereinafter "the warrant") in petitioner's case for February 2, 1982. On the same date the Governor of the State of Florida signed the warrant, petitioner filed a motion to vacate judgment and sentence, pursuant to Rule 3.850 Fla.R.Crim.P., (hereinafter "Motion to Vacate") in the trial court.

An evidentiary hearing on the Motion to Vacate was held on January 12, 1982. The trial court denied the Motion to Vacate on January 14, 1982. On January 28, 1982, the Florida Supreme Court affirmed the trial court's order denying the Motion to Vacate.

On January 27, 1982, the petitioner filed his Petition for Writ of Habeas Corpus in the United States District Court, Middle District of Florida (hereinafter "this Court"), raising the following thirteen grounds:

A. Insufficiency of Evidence

B. Refusal to Consider Relevant Mitigating Circumstances

C. Striking Aggravating Circumstances

D. Refusal to Instruct Jury on a Lesser Included Offense

E. The Supreme Court of Florida's Improper Ex Parte Consideration of Extra-Record Materials

F. Systematic Exclusion of Death Scrupled Jurors

G. Improper Overriding of Jury's Verdict of Life Imprisonment

H. Unconstitutionality of Trial Court Overriding Jury Verdict of Life and Imposing a Sentence of Death

I. Improper Restriction of Mitigating Circumstances

J. Refusal to Sever Counts

K. Improperly Admitted Prejudicial Evidence

L. Improper Closing Argument

M. Unconstitutional Aggravating Evidence

Concurrent with the filing of his Petition for Writ of Habeas Corpus, petitioner filed his Application for Stay of Execution with this Court and, shortly thereafter, filed for a stay in the Eleventh Circuit Court of Appeals. The latter remained pending during this Court's deliberation on the petition.

On January 29, 1982, this Court held an evidentiary hearing on the issues raised by the petition with the petitioner present. In an opinion filed on January 30, 1982, this Court addressed each of the thirteen grounds raised and denied the petition. *Dobbert v. Strickland,* 532 F.Supp. 545 (M.D.Fla.1982). This Court issued a certificate of probable cause under 28 U.S.C. § 2253 but denied petitioner a stay of execution of sentence. A stay was granted, however, by the Eleventh Circuit Court of Appeals on February 25, 1982. The appellate court found that additional time was required to properly consider the merits of the claims raised in the January 27, 1982, petition. *Dobbert v. Strickland,* 670 F.2d 938, 940 (11th Cir.1982). On October 19, 1983, the court of appeals affirmed this Court's decision denying the petition on all thirteen grounds.

While the court of appeals was reviewing the Petition for Writ of Habeas Corpus, the petitioner filed a Petition for Writ of Error Coram Nobis with the Florida Supreme Court on February 16, 1982. Petitioner asserted that his conviction should be vacated on the ground that the incriminating testimony of his son, Ernest John Dobbert, III incriminating testimony of his son, Ernest John Dobbert, III (hereinafter "John") was false. Accompanying the petition was a sworn affidavit by John which contained an alleged recantation of the incriminating testimony he had given at trial and by deposition. The Florida Supreme Court dismissed the petition on May 13, 1982.

The petitioner then filed a second Petition for Writ of Habeas Corpus with this

Court on November 8, 1982, claiming that his conviction of first degree murder was based solely upon perjured testimony in violation of due process protections. *Dobbert v. Strickland,* Case No. 82–1014 (M.D. Fla. May 6, 1983). This Court dismissed the petition without prejudice on May 6, 1983, and allowed the petitioner to return to state court to exhaust state remedies as to his constitutional claims.

The petitioner returned to the trial court and filed his second Motion to Vacate on June 24, 1983. The petitioner asserted three grounds for relief based on the allegedly perjured testimony of John, stating that:

1. A conviction of murder in the first degree and sentence of death based solely upon perjured testimony violates due process as guaranteed by the fifth and fourteenth amendments of the United States Constitution.

2. The defendant was denied his right to a fair trial under the sixth amendment and to effective assistance of counsel under the eighth amendment to the United States Constitution by his counsel's failure to cross examine and impeach Ernest John Dobbert, III.

3. The prosecutor's use of testimony he knew or should have known to be perjured to obtain a fourteenth amendments to the United States Constitution.

On October 17, 1983, a hearing was held before Judge R. Hudson Olliff who heard testimony from John D. Southwood, petitioner's trial counsel, Harry L. Shorstein, state prosecutor at trial, and Baya Harrison, an attorney called as an expert on behalf of petitioner. Relying on the entire record of the case and the testimony at the hearing, Judge Olliff entered his order (hereinafter "Olliff's Order") with extensive findings and denied the second Motion to Vacate on May 1, 1984.

Notice of Appeal to the Florida Supreme Court was filed on May 30, 1984. The parties filed their briefs and oral argument was held on August 28, 1984. The issues as raised by the petitioner's brief were as follows:

1. The conviction of first degree murder and the sentence of death in this case are unlawful under the fifth, eighth, and fourteenth amendments to the United States Constitution in that they are based on testimony made unreliable because it was taken from a child who had been drugged, isolated, hypnotized and subjected to undue influence by the prosecutor prior to trial.

2. The court erred in denying relief based upon ineffective assistance of counsel.

3. Whether the court erred in applying the *Knight* standard [rather than the standard] enunciated in *Strickland v. Washington* [—— U.S. ——], 104 S.Ct. 2052 [80 L.Ed.2d 674] (1984).

4. The appellant has a constitutional right to a new trial or to a sentence less than death under the fifth, eighth, and fourteenth amendments to the United States Constitution because the only witness to testify against the appellant has now sworn under oath that his trial testimony was false.

(a) Federal case law establishes that the due process clause requires that a new trial be granted in the appellant's case.

(b) The reliability of a conviction based upon the testimony of one who has recanted is insufficient to sustain a conviction of first degree murder and a sentence of death under the fifth, eighth, and fourteenth amendments to the United States Constitution.

While the appeal of Judge Olliff's order denying the second Motion to Vacate was pending before the Florida Supreme Court and after the Governor had signed the warrant, the petitioner filed three *new* motions. On August 17, he filed an Amended Emergency Motion For Order Permitting Trial Court To Consider Certain Matters During Pendency Of This Appeal, seeking to raise the following three issues:

a. The trial court's inclusion of an instruction that Petitioner could be

found guilty of first degree murder if the jury found he had committed, among others, an "abominable and detestable crime against nature."

 b. The trial court's failure to instruct the jury on any of the elements of the underlying offenses enumerated for felony-murder.

 c. The death penalty is being discriminatorily applied in this state with regard to the race of the victim.

On August 20, he filed a Second Amendment To Emergency Motion For Order Permitting Trial Court To Consider Certain Matters During Pendency Of Appeal, seeking to raise the issue of During Pendency of Appeal, seeking to raise the issue of ineffective assistance of trial counsel in not objecting to the instruction that petitioner could be found guilty of first degree murder if the jury found he had committed among others an abominable and detestable crime against nature. Then, on August 23, he filed a Petition for Writ of Habeas Corpus wherein he raised the issue of the failure of petitioner's appellate counsel to raise issues involving the jury instruction by the trial court.

On August 20, 1984, the Florida Supreme Court allowed the petitioner to return to the trial court for consideration of the four additional issues raised in the motions of August 17 and 20. The petitioner raised the following issues before Judge Olliff who was directed by the Florida Supreme Court to consider and rule on the issues by 5:00 p.m. on August 24, 1984:

1. The trial court's inclusion of an instruction that appellant could be found guilty of first degree murder if the jury found he had committed, among others, an "abominable and detestable crime against nature."

2. The trial court's failure to instruct the jury on any of the elements of the underlying offenses enumerated for felony murder.

3. The claim that the death penalty is being discriminatorily applied in this state with regard to the race of the victim.

4. Failure to object to the "abominable and detestable" instruction or to object to the failure to give instructions on the elements of the underlying offenses constitutes ineffective assistance of counsel in violation of his right.

A hearing on the four additional issues was held before Judge Olliff on August 22, 1984. Having heard the argument of counsel and the testimony of Mr. Southwood on these issues, the judge entered his order on August 24, 1984. Judge Olliff found that three of the issues raised should have been before the state court on petitioner's previously filed Motions to Vacate. Allowing them to be raised for the first time would amount to piece-meal litigation and an abuse of the Rule 3.850 procedures. Additionally, the court found that the claim regarding the effectiveness of counsel as to the jury instructions had been raised previously and denied on the merits by the court's order of May 1, 1984.

On August 28, 1984, the Florida Supreme Court found no merit to Dobbert's claims of (1) ineffective assistance of counsel, (2) that his murder conviction was based solely on perjured testimony of John Dobbert III, (3) that the prosecutor used testimony which he knew or should have known was perjured testimony, (4) that the trial court erred in giving a certain jury instruction and in not giving another instruction, (5) that the death penalty is being discriminatorily applied in this state with regard to the race of the victim, and (6) that counsel's failure to object to the giving of a particular jury instruction and to object to the failure to give another instruction constitutes ineffective assistance of counsel. The Court also denied the Petition for Writ of Habeas Corpus filed before the Florida Supreme Court on August 23, 1984, alleging ineffective assistance of appellate counsel.

The petitioner filed his third Petition for Writ of Habeas Corpus by Person in State Custody in this Court on August 30, 1984. On that same date, petitioner filed his Motion for Stay of Execution and his Memo-

randum of Law in Support of Motion for Stay of Execution which briefed the following grounds for relief:

POINT I: The conviction of first degree murder and sentence of death in this case are unlawful under the fifth, eighth, and fourteenth amendments to the United States Constitution in that they are based on testimony made unreliable because without notice to the court it was taken from a child who had been drugged, isolated, hypnotized and subjected to undue influence by the prosecutor prior to trial, was admittedly perjured, and has been recanted since the trial.

POINT II: The petitioner's right to the effective assistance of counsel under the sixth and fourteenth amendments to the United States Constitution was violated by trial counsel's failure to effectively cross-examine the state's primary witness or to adequately bring out the hypnosis, drug, and undue influence issues.

POINT III: The state court's consideration of this case does not preclude a *de novo* review by the federal court because the state court reviewed the ineffective assistance claim under the *Knight* standard instead of the standard enunciated in *Strickland v. Washington.*

POINT IV: The petitioner has a constitutional right to a new trial or to a sentence less than death under the fifth, eighth, and fourteenth amendments to the United States Constitution because the only witness to testify against the petitioner has now sworn under oath that his trial testimony was false.

A. Due process requires that a new trial be granted in the petitioner's case.

B. The reliability of a conviction based upon the testimony of one who has recanted is insufficient to sustain a conviction of first degree murder and a sentence of death under the fifth, eighth, and fourteenth amendments to the United States Constitution.

POINT V: The use of testimony by the prosecutor who knows or should reasonably know which is false violates the petitioner's right to due process of law under the fifth, sixth, and fourteenth amendments to the United States Constitution.

POINT VI: Petitioner's conviction and sentence are violative of his right to a fair trial and to due process under the fifth, sixth, and fourteenth amendments to the United States Constitution and a sentence of death is contrary to the right to be free from cruel or unusual punishment under the eighth and fourteenth amendments to the United States Constitution, because the conviction and sentence are based upon a statute which had been declared unconstitutional prior to the date of the offense.

POINT VII: Petitioner was denied the effective assistance of counsel and the right to a meaningful appeal guaranteed by the sixth and fourteenth amendments to the United States Constitution, and a sentence of death would be contrary to the eighth and *fourteenth amendments to the United States Constitution, because appellate counsel failed to raise or argue the trial court's giving of an instruction based on an unconstitutional and nonexistent statute and its failure to instruct[i]on the underlying elements of the felony-murder offense.

POINT VIII: Appellant was denied the effective assistance of counsel under the sixth and fourteenth amendments to the United States Constitution because of trial counsel's failure to object to a jury instruction based on an unconstitutional and nonexistent statute, and to the trial court's failure to give the elements of the underlying felony murder offenses.

The petitioner filed a Memorandum of Law in Response to Abuse of the Writ Allegation and requested oral argument and an evidentiary hearing on those points. This Court granted the latter request and

scheduled an evidentiary hearing for September 1, 1984.

In the first section of this Opinion, this Court discussed the history of the case from the petitioner's conviction in 1974, through a succession of attacks on that conviction, to the present third petition for habeas corpus relief. In section two, this Court will address Points I–V, which were presented to the trial judge on petitioner's second Motion to Vacate. The trial judge held an evidentiary hearing on the second Motion to Vacate and ruled on the merits of the claims. The first part of section two will focus on Points I, IV, and V, dealing with the issue of the reliability of testimony given at the petitioner's murder trial. In the last part of section two, Points II and III, dealing with the issue of ineffective assistance of counsel, are discussed. In section three, this Court will address Points VI, VII, and VIII which were first raised before the Florida Supreme Court after the Governor signed the warrant.

When the petitioner filed his first Petition for Writ of Habeas Corpus, this Court read the entire trial transcript and all pleadings filed up to that date. This Court has now read the pleadings filed subsequent to the first Petition for Writ of Habeas Corpus, the transcript of the evidentiary hearing before Judge Olliff, again has reviewed the entire record in the case, and, upon the record and the evidentiary hearing held on September 1, 1984, enters the following opinion.

## SECTION TWO: POINTS I, II, III, IV, AND V

### Points I, IV, and V

Points I, IV, and V assert that the petitioner's constitutional rights were violated when the testimony of an unreliable witness was used to incriminate him. At this Court's hearing, petitioner's oral argument on the three Points focused on the reliability of John's testimony. Having reviewed the petitioner's claims, this Court agrees that this issue is pivotal to a determination on the three Points. In Point I, the petitioner asserts the various grounds establishing unreliability, i.e., John had been drugged, isolated, hypnotized, subjected to undue influence by the prosecutor and, further, he had recanted, therefore, his 1974 trial testimony was perjured. In Point IV, the petitioner relies on the assertion that John's testimony was false in declaring that he is entitled to a new trial or to a sentence less than death under the guarantees of substantive due process. Finally, in Point V, the petitioner again relies on the assertion that John's testimony was false in asserting that its use at trial by a prosecutor who knew or reasonably should have known it was false violated petitioner's rights under due process. The Court further notes that the state court considered the issues presented before this Court in Points I, IV, and V and found they were "entwined and ... dependent upon one another by evidence, testimony, and proof." (Olliff's Order at 14).[1]

An evidentiary hearing on the issues was held by Judge Olliff who heard testimony from Baya Harrison (hereinafter "Harrison"), a trial attorney called as an expert witness by the petitioner, John D. Southwood (hereinafter "Southwood"), petitioner's defense attorney at his murder trial, and Harry Louis Shorstein (hereinafter "Shorstein"), the prosecutor at petitioner's murder trial. At petitioner's request, Judge Olliff took judicial notice of the entire trial record, including the trial tran-

---

**1.** The interrelation of the three Points is evident when reviewing their presentation and consideration before Judge Olliff in the petitioner's second Motion to Vacate. Claim No. 1 of that motion asserted that "the conviction and sentence on first degree murder was based solely upon perjured testimony." (Olliff's Opinion at 14). Therefore, the state court findings regarding Claim No. 1 are relevant to both Points I and IV, demonstrating their interrelatedness.

Claim No. 3 of the second Motion to Vacate stated that "the prosecutor used testimony which he knew or should have known was perjured testimony." (*Id.*) The issues of fact in Claim No. 3 are, therefore, relevant to the issues involved in Point V.

Judge Olliff found that Claim No. 1 (now presented as Points I and IV) and Claim No. 3 (now presented as Point V) were entwined and discussed the two claims together.

script and the case file. (Tr. at 12–13). Additionally, the court had for its review John's 1974 murder trial testimony, statements he had made in both a pretrial deposition taken by Shorstein for the murder trial (hereinafter "prosecution deposition"), and a 1977 deposition taken in a collateral civil action (hereinafter "civil deposition"), a 1972 sworn affidavit by John of statements made to police investigators (hereinafter "1972 affidavit"), and a 1982 sworn affidavit by John in which he recanted his 1974 trial testimony (hereinafter "1982 recantation").

The witnesses were examined regarding these documents as well as their personal preparation for and participation in the 1974 murder trial. After reviewing the evidence, including the two hundred and fifteen page transcript of the testimony taken at the hearing, Judge Olliff entered his order with extensive findings of fact on the issues relevant to John's credibility at trial and the correctness of the conduct of both Southwood[2] and Shorstein. The state court's determination of the following factual issues was made after a hearing on the merits.

Pursuant to *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) and 28 U.S.C. § 2254(d), the factual determinations of a state court are presumed correct unless certain deficiencies existed. *Id.* at 547, 101 S.Ct. at 769. It has not been alleged by either side that any of the stated deficiencies existed and this Court finds they did not. The following depiction of the petitioner's state court proceeding on the issues now before this Court are not disputed. Petitioner, assisted by counsel, participated in an evidentiary hearing before a court of competent jurisdiction. The state court's fact finding procedure was adequate in affording a full and fair hearing at which the material facts were fully developed. The petitioner received a full, fair, and adequate hearing in the state court, his due process rights were not violated, and the merits of the factual disputes were resolved at that hearing. Therefore,

*Sumner* and § 2254(d) are applicable and the state court's findings are presumed correct. However, this Court has further reviewed the record of the state court proceeding pertinent to a determination of the sufficiency of the evidence supporting Judge Olliff's findings and finds they are supported by the record. Section 2254(d)(8).

This Court's review of the record and the state court findings will be discussed in three parts. First, those findings related to the credibility of John's trial testimony in light of the 1982 recantation will be examined. In the second part, this Court will review those findings dealing with the assertion that medication, isolation, and hypnosis therapy affected John's reliability as a witness. In the third part, this Court will examine Judge Olliff's findings on Shorstein's conduct as it relates both to the charge of undue influence, and, secondly, to the allegation that he used testimony he knew or reasonably should have known was false.

*Recantation*

The petitioner relies on John's 1982 recantation in asking the court to wipe clean John's incriminating trial testimony and find that petitioner's conviction was violative of due process protections. As evidence that the 1982 recantation is more credible than John's conflicting trial testimony, the petitioner offers John's 1972 affidavit. According to the petitioner, John states in the affidavit that his sister Kelly Ann had died of flu. The petitioner contends this is consistent with the 1982 recantation and, thus supports its veracity.

In reviewing the 1972 affidavit in its entirety, Judge Olliff found that it failed to support the petitioner's contention that it was exculpatory and inconsistent with John's murder trial testimony. (Olliff's Order at 63). The court was cognizant of John's physical and mental condition at the time and took particular care to review the affidavit, particularly the phrasing of both the police investigators' questions and

---

**2.** *See* discussion of Points II and III, *infra.*

John's answers. (Olliff's Order at 57, 59, 60). Judge Olliff found that at one point that "the police officer asked the 11-year old boy—not what he saw—but to make a scientific-medical determination." (Olliff's Order at 59). Judge Olliff concluded the question reflected "more upon the questioner than ... on the boy." (Olliff's Order at 60).

After reviewing, not what petitioner alleged John had said, but the actual statements in the affidavit, the court found that what John said was that he had been "told" by the petitioner to tell anyone that asked that "Kelly had flu and choked." (Olliff's Order at 61; 1972 affidavit at 20–21). Thus indicating that his statements to the police were reflective of the petitioner's instructions to him, rather than his own observations. Judge Olliff found that John's motivation in following his father's instructions was explained in later testimony when John stated "he did not tell the officers everything [when the 1972 affidavit was taken] because he was afraid of his father." (Olliff's Order at 65; prosecution deposition at 62–63).

The state court also focused on the details of Kelly Ann's death depicted in the 1972 affidavit in contrast to details offered in John's later statements. Judge Olliff reviewed the facts depicted in John's murder trial testimony, prosecution deposition, and civil deposition and determined that they were much more detailed than either the 1972 affidavit or the 1982 recantation. (Olliff's Order at 63, 67). This is consistent with Judge Olliff's earlier finding that out of fear of the petitioner, John had not told the police "everything" at the taking of the 1972 affidavit. (*See* discussion *supra*). The court further found the murder trial testimony, prosecution, deposition, and civil deposition to be consistent in their detailed depiction of the facts and corrobative of each other. (Olliff's Order at 67). This lent credibility to John's murder trial testi-

mony over the events as depicted in the two affidavits. In fact, in the 1977 civil deposition, taken three years after both the prosecution deposition and the murder trial testimony, the court found that John had unequivocally stated that he had told the truth both in the prosecution deposition and at trial. Judge Olliff found John's civil deposition refuted the assertion that his trial testimony was perjury. (Olliff's Order at 79–80; civil deposition at 110–111). Additionally, this Court notes that according to the record before Judge Olliff the petitioner never told Southwood that John's trial testimony was false or otherwise inaccurate. (Tr. at 136).[3]

Judge Olliff thoroughly reviewed the depositions, affidavits, and testimony that John had given at various times and under various conditions. Additionally, the judge had presided at the murder trial and had, therefore, observed the witness' trial testimony. After a hearing on the merits, which included testimony by both the prosecutor and the petitioner's defense counsel at the murder trial, Judge Olliff made exhaustive findings in support of his conclusion that even in light of the 1982 recantation John's trial testimony was not perjured. Judge Olliff found, instead, that there was "no evidence or proof to support [petitioner's] allegation of perjury." (Olliff's Order at 81, 101).

*Medication, Hypnosis Therapy, Isolation*

This Court first notes that the judge ruling on the petitioner's second Motion to Vacate was also the judge presiding at petitioner's murder trial. When John took the stand at the trial, Judge Olliff conducted a preliminary inquiry as to the witness' competency to testify. (Trial Tr. at 2099–2102). After observing the witness and making sufficient inquiry, the court found him competent to testify. (Trial Tr. at 2102).

---

**3.** In fact, the present record reflects that at no time before 1982 did the petitioner tell any of his attorneys that John's trial testimony was false or otherwise inaccurate. This became apparent when counsel at the hearing on the abuse of the writ stated at oral argument before this Court that he was not aware that John's testimony was anything but truthful until the appearance of the 1982 recantation.

After hearing evidence at the state evidentiary hearing concerning the medical treatment John had received prior to trial, Judge Olliff, in considering the claim that John's testimony was perjured, made the following findings as to petitioner's specific assertion that prior to testifying John had been isolated from his family, given psychotropic drugs, and hypnotized. (Olliff's Order at 56; second Motion to Vacate at 7–8).[4] The judge reviewed John's physical and mental state immediately after he removed himself from the petitioner's abusive treatment. Judge Olliff stated that John had been found with "a broken arm, disfigured face, broken nose and blind." (Olliff's Order at 57). During his first interview by police, John recited the "horrors and torture suffered by himself and [his brother and sisters]." *Id.* Judge Olliff found the "isolation" and attendant medical treatment to be completely commensurate with John's experience, stating:

Where else would John III be when his father was in jail charged with murdering two of his own children and his mother was unable and/or unfit to have custody?

What other treatment and care would a child who had been blinded, disfigured, witnessed murders and gone through unspeakable physical and emotional trauma for years receive but medication and subsequent efforts to refresh memory of the gruesome events?

(*Id.*).

Judge Olliff's finding is in accord with this Court's own review of the record which indicates the treatments were therapeutic and not for testimonial purposes. Finally, Judge Olliff found that petitioner had made a "quantum leap" in concluding that because of these circumstances John's testimony was false and that the false testimony was the sole basis of petitioner's first-degree murder conviction. (Olliff's Order at 56).

The petitioner asserts that the trial court lacked notice of John's pretrial medical treatment and, therefore, petitioner's rights were necessarily violated.[5] The trial judge had another opportunity to determine the reliability of John's testimony, though, when evidence on John's treatments was presented at the evidentiary hearing on petitioner's second Motion to Vacate. With all the information before him, Judge Olliff again found John's testimony credible and reliable, stating that there was not "any evidence or proof to support [petitioner's] allegation of perjury." (Olliff's Order at 81, 101). This assumes, of course, that John's treatments were such that the court should have been notified. On cross-examination, Shorstein stated that:

The hypnosis and medication part I discussed with medical experts. And their conclusion and mine, after discussing it with them, is that there was definitely not sufficient evidence of anything that would require a Prosecutor in good faith to indicate to the Court that there was a substantial risk we were introducing evidence that was not proper or not credible, absolutely not.

(Tr. at 201; *see also* Tr. at 208–209).

The record reflects a thorough examination by the state court of the petitioner's assertion that John's isolation, medication, and hypnosis therapy affected the reliability of his testimony. Judge Olliff found that there was no "evidence or proof to support [petitioner's] allegation of perjury." (Olliff's Order at 81, 101). This finding was made having also considered the testimony at the evidentiary hearing at which Shorstein was subjected to vigorous cross-examination regarding John's period of "isolation" from his father, his medical treatment, and the hypnosis therapy John had undergone and Shorstein's contact with John prior to trial. (Tr. at 195–98; 201–202; *see* discussion below and Tr. at 169 *et seq.*).

---

4. The time at which John received medical treatment as well as further issues raised in these allegations, are discussed in Points II and III, *infra.*

5. Southwood and Shorstein's awareness of John's treatments are discussed in Points II and III, *infra.*

*Shorstein's Undue Influence/Use of False Testimony*

Judge Olliff made relevant findings on Shorstein's conduct in both the claim discussed above which raised the issue of undue influence along with the issues of medication, hypnosis, and isolation and the claim that Shorstein used John's testimony which he knew or reasonably should have known was false and made the following findings. As to both claims, the court had before it the record of the evidentiary hearing at which Shorstein testified to his interaction and contact with John both in Wisconsin and in Florida prior to John's testifying at trial as well as to his efforts to assure the truthfulness of John's testimony. Therefore, findings by the state court on these claims are interdependent and this Court will review them accordingly.

The court made preliminary findings as to Shorstein's background, including his trial experience and legal professionalism. (Olliff's Order at 82–83). The court found that Shorstein had had extensive trial experience before being assigned to prosecute petitioner's case. He had served both as a public defender and as a prosecutor, ultimately becoming the Chief Assistant State Attorney. (Olliff's Order at 83; Tr. at 165). Prior to this case, Shorstein had tried over two hundred cases as defense counsel alone. (Tr. at 164). His prosecution preparation of petitioner's case began in August, September 1973. (Tr. at 166).

At the evidentiary hearing, a thorough record was made of Shorstein's meetings with John prior to trial. Part of this time was spent in Wisconsin where John had been removed to receive care and treatment. The record and the court's findings regarding the meetings refute petitioner's allegation that Shorstein either improperly directed John's testimony or used his testimony when he knew or reasonably should have known it was false.

As to the visits which occurred in Wisconsin, Judge Olliff had a thorough record before him. His order sets forth the cross-examination of Shorstein detailing "the number, nature and manner of his visits" with John. (Olliff's Order at 89; Tr. at 169, *et seq.*). Throughout these meetings, the court found that Shorstein's testimony revealed his efforts to ensure the truthfulness of John's testimony. Prior to meeting with John, Shorstein met with "at least three or possibly four different psychiatrists to ask them to help [him] really prepare to deal with the child." (Olliff's Order at 90; Tr. at 170). As his interviews with John progressed, Shorstein continued to consult with experts, including several child psychiatrists, who examined John and advised Shorstein that "there was not a substantial risk of his lying." (Olliff's Order at 87; Tr. at 177). Even after the meetings with John, though, Shorstein was not confident that John would testify at all and, therefore, did not prepare his case based on John's testimony. (Olliff's Order at 91; Tr. at 171, 174–75).

In addition to his detailed recital of facts pertaining to his meetings with John, Shorstein was asked pointedly on cross-examination whether he had ever suggested to John "either directly or indirectly what version of the facts [Shorstein] wanted him to tell." Shorstein replied that he had not. (Olliff's Order at 94; Tr. at 173).

▪▪▪▪ Judge Olliff found, on the basis of the record as hereinabove cited; including a vigorous cross-examination of Shorstein by petitioner's counsel, and after the Court's examination of Shorstein's interaction with John, that "Shorstein did not use—knowingly or otherwise—perjured testimony. Nor is there any proof to support [petitioner's] allegation of perjury." (Olliff's Order at 101).[6] As to undue influ-

---

6. Specifically, as to the charge that Shorstein used testimony he knew or reasonably should have known was false, the petitioner was required to show that: 1) the testimony was false, 2) it was material and 3) it was knowingly and intentionally used by the government to obtain a conviction. *McBride v. United States,* 446 F.2d 229 (10th Cir.1971); *see also Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Skipper v. Wainwright,* 598 F.2d 425 (5th Cir.1979); *Anderson v. United States,* 403 F.2d 451 (7th Cir.1968), *cert. denied,* 394 U.S.

ence claim, the court again found that John's testimony was truthful. (Olliff's Order at 81). Therefore, petitioner has failed to demonstrate any undue influence by the prosecution.

In summary, this Court has reviewed Judge Olliff's findings and has found them to be supported by the record in this case. Judge Olliff, who was the judge presiding at petitioner's murder trial, personally observed the prosecution and the defense of the petitioner, as well as the trial testimony of John. This experience has been supplemented by depositions, affidavits, and an evidentiary hearing on the Motion to Vacate. At the hearing, Southwood and Shorstein were examined and vigorously cross-examined on the issues now before this Court. A thorough record was established on which the state court could base its findings of fact. Judge Olliff's opinion denying the second Motion to Vacate is extensive, demonstrating his thorough review of that record and his considered findings on the factual issues.

■ Judge Olliff found that John's testimony was reliable and that Shorstein was not guilty of any impropriety. This Court having determined that *Sumner* is applica-

ble and having made an independent examination of the record relied on by Judge Olliff, finds that the state court findings are supported by the record in this case. Therefore, this Court finds that the petitioner has not proved a claim for relief under Points I, IV, or V and shall deny relief on those grounds.

### Points II and III

Petitioner asserts in Point II that Southwood, the public defender assigned to represent the petitioner at his trial in state court, rendered ineffective assistance of counsel. In Point III, petitioner alleges that he is entitled to a *de novo* review because this claim was reviewed by the state court applying the *Knight v. State*[7] standard rather than the standard recently enunciated by the United States Supreme Court in *Strickland v. Washington.*[8] This Court has reviewed the claim now before it applying the *Strickland* standard, therefore Point III is not at issue.

As to his claim of ineffective assistance of counsel, the petitioner does not seem to seriously dispute the experience and general professionalism of Southwood. In addition, the petitioner does not dispute the facts concerning the pretrial preparation of

903, 89 S.Ct. 1009, 22 L.Ed.2d 215 (1969). Even if the petitioner had proved John's testimony was perjured, the petitioner has clearly not demonstrated that it was knowingly and intentionally used. *See supra* this Opinion at 1429. As to materiality, issues remain as to the weight given John's testimony by the trier of fact. In addressing the petitioner's allegation that John's testimony was false and that it was *solely* upon this evidence that he was convicted of the first degree murder of his daughter, Judge Olliff found that petitioner had made "a quantum leap" [in concluding] that because of those circumstances (discussed above), the testimony of John at trial was a lie and that such lie was the *sole basis of conviction of murder in the first degree.* (Olliff's Order at 56) (emphasis added). Shorstein himself testified that he was never "confident" John would testify and, therefore, did not build his case on John's on-stand testimony. (Tr. at 174–75). Instead, his case was built "through little John, not through little John's testimony." (Tr. at 174). Shorstein's case was one of circumstantial evidence which cumulatively was intended to persuade a rational trier of fact that the evidence supported a first-degree murder conviction. (Tr. at 174–75);

see Respondent's Response in Opposition to Motion for Stay of Execution or in the Alternative Response to Petition for Writ of Habeas Corpus and Memorandum of Law in Support, dated September 1, 1984, at 34–38. Southwood repeatedly testified that in his professional judgment John's trial testimony was not evidence of first degree murder, (Tr. at 124–125, 128–135, 147), although "there was other testimony to establish premeditated murder." (Tr. at 125).

Furthermore, the above-stated analysis addresses the petitioner's assertion that John's recantation necessitates a new trial under *Quinn v. Duckworth,* 567 F.Supp. 518 (N.D.Ind.1983). That case requires that the petitioner demonstrate that: 1) the testimony given by a material witness was false, 2) without the testimony the jury might have reached a different conclusion, and 3) the movant was taken by surprise when the false testimony was given. As to the third factor, *see supra* note 3.

7. 394 So.2d 997 (Fla.1981).

8. —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

the case. Therefore, this Court will briefly review the record including the state court's findings in these areas before proceeding to the grounds for the ineffective assistance of counsel allegation.

At the time he took petitioner's case in November 1973, Southwood had practiced law in the Public Defender's Office for five years—exclusively representing defendants in criminal cases. (Tr. at 85–86). Prior to taking over the capital cases division in 1972, he had tried approximately twenty jury trials. (Tr. at 87). He had tried an estimated ten first and second degree murder cases before being assigned to petitioner's case. (Tr. at 88).

Southwood's pretrial preparation of petitioner's case was thorough and considered. He personally deposed approximately forty-one persons,[9] filed and argued all motions,[10] and kept in constant contact with the petitioner. (Tr. at 95–96, 99, 104). Although he was lead counsel in charge of trial tactics and strategy, he consulted with other assistant public defenders, the Public Defender himself, Lou Frost, and at trial was assisted by Assistant Public Defender Hal Taylor. (Tr. at 90). Southwood was further supported in his exhaustive preparation of the case by other assistant public defenders, investigators, and legal interns. (Tr. at 90–91). Southwood testified that "no case ... [had] ever received as much time and effort devoted to it." (Tr. at 90). Southwood further stated that he had never been "better prepared to know what the witnesses were going to say, what the law was, and what the issues were in the case." (Tr. at 105).

In alleging that he received ineffective assistance of counsel, the petitioner's primary focus is on one aspect of Southwood's handling of the pretrial and trial. The petitioner contends that Southwood failed to vigorously cross-examine one witness, John, the petitioner's son who gave incriminating testimony at trial. The petitioner alleges two grounds for his assertion that Southwood's cross-examination was improper:

1. Southwood failed to impeach John with a prior inconsistent statement, and

2. Southwood failed to question John on the issues of isolation from family prior to trial, his medical treatment, his hypnosis therapy, or that the prosecutor had unduly influenced him.

These grounds were considered by the state court on the petitioner's second Motion to Vacate. Judge Olliff held a hearing on the petitioner's claim that he had received ineffective assistance of counsel at his murder trial. The court heard extensive testimony regarding both the tactical decision to limit cross-examination and the pretrial and trial condition of John relevant to his testimony. The recorded testimony demonstrates that the issues now raised were before Judge Olliff and were considered in the determination of his findings.[11]

As to the failure to impeach, the petitioner relies on a 1972[12] affidavit consisting of statements by John to police officers soon after he was found battered and wandering the streets in 1972. (Olliff's Order at 22–23). The witness told police investigators that his younger sister, Kelly, had died of the flu. The petitioner's contention is that these pretrial statements were exculpatory and inconsistent with the witness' incriminating trial testimony. Therefore, according to petitioner, the affidavit should have been used by Southwood to impeach the witness' incriminating testimony.

The existence of the 1972 affidavit is not disputed. Southwood contended at the evidentiary hearing that the decision to not

---

**9.** These depositions are listed in Olliff's Order at 91.

**10.** The litany of motions filed by Southwood are listed in Olliff's Order at 92.

**11.** *See* this Court's discussion of *Sumner, supra; see also* this Opinion at 1426.

**12.** The affidavit's validity as a prior inconsistent statement has been discussed by this Court. *See* this Opinion at 1426–1427.

use the prior statement was integral to his "cold, calculated trial decision" to limit the cross-examination of John. (Tr. at 109). The petitioner contends that failure to use the affidavit could not have been the product of a conscious strategy because Southwood did not have possession of the document at the time of trial. Judge Olliff found there was no question that Southwood had possessed the affidavit. (Olliff's Order at 23).

The significance of Southwood's having had actual possession of the affidavit prior to trial is diminished by the fact that it is not disputed Southwood was aware at that time of its contents. The record shows that in a pretrial deposition of John, Southwood alluded to the statements appearing in the 1972 affidavit. (Tr. at 115–116). In addition, there are indications that Southwood did in fact have the 1972 affidavit. Shorstein testified that he complied with discovery, furnishing Southwood with the affidavit and, further, that he had exercised an open-file policy that allowed Southwood access to all documents in his possession. (Tr. at 179).[13] Therefore, there was a conscious decision by Southwood not to impeach with the prior statement and the reasonableness of that decision was at issue before Judge Olliff.

The next ground, involving Southwood's cross-examination of John on the issues of his isolation, medical treatment, hypnosis therapy, and undue influence, was also before Judge Olliff. Initially, this Court notes that there is nothing in the state court's record that would indicate that John was under the influence of either medication or hypnosis *at the time* of his trial testimony. Both Southwood and Shorstein's testimony indicate there was no concern that John was under the influence of medication or hypnosis at the time of trial; these treatments were administered at times before and after trial. (Tr. at 117–119, 138–140, 196). Therefore, this Court will focus on the petitioner's contention that the witness was affected by factors prior to trial which Southwood should have brought out in cross-examination.

The record reflects the therapeutic nature of both the medication administered to John and the hypnosis therapy he underwent. There is no question that John had experienced extreme mental and physical abuse. (Olliff's Order at 46–48; Tr. at 174–75). His "isolation" from family consisted of removing him from a hostile atmosphere to one that was therapeutic. The administration of his care was under the constant supervision of experts including child psychiatrists. (Tr. at 176–77). Shorstein was required to cautiously approach John within this atmosphere of security so as not to disrupt his therapy. (Tr. at 170). The entire design of John's care was to promote his mental and physical well-being.

Southwood knew that John was undergoing extensive medical treatment during the period prior to testifying at petitioner's trial.[14] Shorstein testified that "[d]efense [c]ounsel was aware "of John's medication and hypnosis therapy. (Tr. at 208–209). This is consistent with Southwood's testi-

---

**13.** To support his contention that Southwood did not have actual possession, the petitioner attempts to prove a negative—he tries to establish that Southwood did not have possession of the affidavit by demonstrating that Southwood cannot affirmatively show that he *did* have possession. Reliance is placed on Southwood's testimony where he acknowledges his uncertainty as to whether he had seen the affidavit before. (Tr. at 113). As further proof that Southwood could not have had possession, the petititoner states that a copy of the affidavit could not be located in Southwood's file.

However, the record supports Judge Olliff's finding that Southwood did have possession of the 1972 affidavit prior to trial. Southwood's testimony indicated only that he had no inde-

pendent recollection of the particular document. Southwood admitted that there undoubtedly were many of the voluminous documents filed in the case that he could not independently recollect. (Tr. at 113). He further admitted that his recollection was hindered by the fact that he could not obtain access to his trial file to verify whether the affidavit was a part thereof. (Tr. at 114).

**14.** Although the evidence regarding Southwood's knowledge of John's medication is ambiguous, he admitted he was not specifically aware of the use of psychotrophic medication in conjunction with John's hypnosis therapy. (Tr. at 140).

mony regarding the cautioned approach he would take with John on the stand. Southwood testified "that knowing of where [John] was, knowing of the condition he was in, the treatments he had been under, it would not have been impossible for him to break down [on the stand]." (Olliff's Order at 32; Tr. at 107). Likewise, both Southwood and Shorstein testified to their awareness that John had undergone hypnosis therapy "months before trial." (Tr. at 139–40, 196). Judge Olliff was made aware of the treatment of John and the details regarding Shorstein's contact with John prior to trial through Shorstein's examination and cross-examination. (Tr. at 169, *et seq.*, *see* discussion of Points I, IV, and V, *supra*). Having these issues in the record before him, Judge Olliff made certain findings, discussed as follows, which this Court finds are supported by the record.

The court recognized Southwood's contention that the decision not to impeach John's testimony, including his decision not to use the prior inconsistent statement and to refrain from questioning John as to his pretrial isolation from his family, medical treatment and hypnosis therapy, were made within the framework of his desire to avoid extensive cross-examination and limit John's on-stand testimony. (Olliff's Order at 44, 48; Tr. at 109, 155). The petitioner asserted that Southwood's limited cross-examination was unreasonable under the circumstances and offered the testimony of trial attorney Harrison as an expert witness in support of his assertion. Harrison testified that the limited scope of Southwood's cross-examination of John did not evidence any kind of strategy and, instead, was an act or omission substantial, serious, and measurably below that of competent counsel. (Tr. at 53–54, 31).[15]

The state court found that after the direct examination of John, Southwood felt that the testimony had not significantly damaged the defense. (Olliff's Order at 32; Tr. at 154). He conferred with his trial co-counsel, Mr. Taylor, and decided in his best professional judgment, based on years of criminal trial experience, that the proper trial tactic was to limit cross-examination. (Olliff's Order at 32; Tr. at 105, 108–110). In this way, Southwood expected to avoid exacerbating an already bad situation. Even Shorstein testified that he was not at all surprised John was not cross-examined by Southwood regarding the prior inconsistent statement, the hypnosis therapy, or that the cross-examination was generally very limited. (Tr. at 198–99). Shorstein stated that Southwood made his point on cross and "when you get a good point, leave, especially when you have got a very damaging witness." (Tr. at 210). The record reflects and Judge Olliff found that, relying on his exhaustive pretrial preparations, including the prior depositions and statements of the witness and being aware of the witness' physical and mental condition, Southwood knew that further time on the stand could lead to some damaging results. (Olliff's Order at 48). The Court reviewed the potential liabilities of an extensive cross-examination of the witness and found the following factors relevant.

A limited cross-examination permitted Southwood to avoid a rendition by the young witness of the "parade of horribles" that prior interviews of the witness had revealed. These were circumstances of abuse, torture, and details of the alleged murders, that the witness had revealed during pretrial interviews but which were not brought out on direct examination. (Tr. at 107, 108, 155). [These "horribles" are recounted in Olliff's Order at 119–20]. Some of these abuses were *so* horrible, John could only reveal them after successive psychiatric sessions involving hypnosis therapy. (Tr. at 177–78). Cross-examination as to John's medical treatment could easily have led to a recitation of the "horribles" he had experienced which necessitated that treatment.

---

**15.** Harrison did not observe or participate in the 1974 murder trial or in Southwood's defense strategy sessions. Harrison's knowledge of

Southwood's strategy is drawn from his having read the trial transcript and one deposition. (Olliff's Order at 24; Tr. at 59).

The record reflects and Judge Olliff found that Southwood was also aware that recounting these horrible events, which the witness himself had observed and at times had been the victim of, could have caused the witness to lapse into hysteria or to break down emotionally on the stand. (Olliff's Order at 45; Tr. at 107, 110, 145–46). Southwood felt that this would unduly prejudice his case and perhaps lead to further damaging recitals. (Tr. at 110, 145–46).

The state court further found that Southwood determined in his professional judgment that the direct testimony did not satisfy the premeditation requirements for establishing first degree murder. (Olliff's Order at 39; Tr. at 147). Southwood was aware from prior depositions that cross-examination could elicit testimony relevant to a finding of premeditation and thus increase the probability of the jury finding the petitioner guilty of first degree murder. (Tr. at 111, 148–49, 153–55). For example, in one deposition the witness stated that his father "had wanted Kelly to die." (Tr. at 111).

Applying the standard for analyzing a claim of ineffective assistance of counsel expressed in *Knight v. State*, 394 So.2d 997 (Fla.1981), Judge Olliff found on the record before him and in light of his findings, that petitioner had "failed to prove that any act or omission by Southwood ... were substantial and serious deficiencies measurably below that of competent counsel." (Olliff's Order at 50). The court recognized that the cross-examination of a witness was a matter within the judgment and strategy of trial counsel and, thus, not a proper ground for complaint or relief. (Olliff's Order at 51 citing *Ferby v. State*, 404 So.2d 407 (Fla. 5th DCA 1981)). Judge Olliff, who had also presided at the trial of petitioner and who had observed Southwood's defense tactics, found Southwood to be "among the most competent, effective and ethical members of the ... Bar. Of the twelve or more first degree murder defend-

ants tried by me in the last fourteen years, this defense by Southwood ... was one of the best—if not the best—I have judged." (Olliff's Order at 101, 102).

Judge Olliff had personally observed Southwood's trial defense. At the evidentiary hearing, he heard the extensive examination and cross-examination of Southwood regarding his decision to limit cross-examination to not impeach, as well as his awareness of John's medical treatment and hypnosis therapy. Judge Olliff's one hundred and two page opinion sets forth extensive findings relevant to the issues raised in this claim.

■ The issue of ineffective assistance of counsel is a mixed question of law and fact. Pursuant to *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) and 28 U.S.C. § 2254(d), the factual determinations of a state court are presumed correct.[16] This Court has further reviewed the record of the state court proceeding pertinent to a determination of the sufficiency of the evidence supporting Judge Olliff's findings and finds those factual determinations by Judge Olliff are supported by the record. Section 2254(d)(8). This Court shall, therefore, review these findings in light of the recent case law.

■ The sixth amendment guarantees a criminal defendant legal representation by an attorney "reasonably likely to render *and rendering* reasonably effective assistance." *Herring v. Estelle*, 491 F.2d 125, 127 (5th Cir.1974), quoting *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir.1960), *adhered to in pertinent part on rehearing en banc*, 289 F.2d 928 (5th Cir), *cert. denied*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961) (emphasis by *MacKenna* panel). The reasonably effective assistance standard has recently been held by the United States Supreme Court to be the proper standard to apply. *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The reasonableness of

---

**16.** This Court has previously analyzed Judge Olliff's findings under a *Sumner*/section 2254(d) analysis and has found the presumption of correctness rule enunciated in *Sumner* applicable. *See supra* this Opinion at 1426.

counsel's conduct must be judged on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.* 104 S.Ct. at 2066.

■ *Strickland,* the Supreme Court set forth a two-component analysis to apply in determining whether an actual ineffectiveness claim has been stated. The first component requires that the movant demonstrate that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 2065. This first component can be divided into two steps: 1) identification by the movant of the act or omission of counsel that is alleged not to have been the result of reasonable professional judgment; and 2) review by the court of the act or omission in light of all the circumstances to determine whether the conduct falls outside the wide range of professionally competent assistance. *Id.* at 2066.

■ If the two steps of the first component are met, the reviewing court then considers the second component which requires that the movant demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. The reviewing court is to remain cognizant of the prevailing professional norms appropriate to the given factual situation and is to presume that counsel exercised reasonable professional judgment in making all significant decisions.

The first step of a *Strickland* analysis has been met. The petitioner has identified Southwood's limited cross-examination as the act or omission allegedly the product of counsel's failure to exercise reasonable professional judgment. As noted above, the professionalism and experience of Southwood is not seriously disputed. Therefore, to determine whether Southwood's conduct fell below an objective standard of reasonable professional judgment, the Court must review his limited cross-examination in light of the circumstances of this particular case and determine whether the petitioner has overcome the presumption that the challenged action "might be considered

sound trial strategy." *Id.* at 2066, quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955).

■ Pursuant to the second step of a *Strickland* analysis, the Court having reviewed the record and the findings of the state court in light of the totality of circumstances in this particular case, finds that Southwood's conduct did not fall outside the wide range of professionally competent assistance. *Strickland v. Washington,* 104 S.Ct. at 2066. Courts consistently recognize deference must be given to trial tactics and strategy which lie within the personal judgment and discretion of trial counsel. *Adams v. Wainwright,* 709 F.2d 1443 (11th Cir.1983); *Stanley v. Zant,* 697 F.2d 955, 965 (11th Cir.1983); *Horsley v. Simpson,* 400 F.2d 708, 710 (5th Cir.1968). This is particularly true regarding the decision to cross-examine. *Washington v. State,* 397 So.2d 285 (Fla.1981); *Robinson v. State,* 378 So.2d 1346 (Fla.3d DCA 1980). Southwood's decision to limit cross-examination was well intended to avoid the parade of horribles that obviously could have resulted from extended cross-examination. Any questions directed to John's treatments prior to trial would result in Shorstein's rehabilitation of the witness by reciting the brutal acts and abuses which necessitated isolation from a troubled family background, medical treatment, and hypnosis therapy to unlock abuses too horrible to relate. (Tr. at 128). It is also logical that any reference to Shorstein's meetings with John would open the door to an explanation of why such conferences, including consultations with psychiatrists, were required. The Court agrees with Judge Olliff's finding that such matters are "within the judgment and strategy of trial counsel." (Olliff's Order at 51).

The petitioner has failed to meet the first component because he did not demonstrate a failure by Southwood to exercise reasonable professional judgment under the circumstances. Therefore, the Court need not deal with the second component, and determine whether there was a reasonable probability that the proceedings were affected.

*Strickland v. Washington,* 104 S.Ct. at 2068.

In summary, this Court, pursuant to the dictates of *Sumner* and its own determination that the state court findings are supported by the record, has considered the factual issues relevant to Southwood's limited cross-examination of John in light of *Strickland.* Examining his decision under the totality of circumstances in this particular case, this Court finds that Southwood's conduct did not fall outside the wide range of professionally competent assistance. The Court is mindful that it is all too tempting to second-guess a counsel's decision after the fact. This Court does not indulge in hindsight but has attempted to fairly assess Southwood's conduct under the circumstances of this case and has evaluated his decision from his perspective at the time. *Strickland v. Washington,* 104 S.Ct. at 2065–66. Therefore, the relief sought on Points II and III is denied.

### SECTION THREE: POINTS VI, VII, AND VIII

#### *Points VI, VII, and VIII*

This Court has reviewed the claims discussed in Section Two (Points I–V) on their merits. The court will not review the claims discussed in this Section (Points VI–VIII) on their merits for the following reasons. Points VI, VII, and VIII were first raised after Governor Graham signed the third warrant for Dobbert's execution on August 8, 1984. On August 20, 1984, petitioner returned to the trial court for consideration of three new issues for relief. These issues included allegations that the trial court erred in giving a certain jury instruction, that the trial court erred in not

giving instruction as to any of the elements of the underlying offenses enumerated for felony-murder, and that failure to object to the giving of a jury instruction or to object to the failure to give instructions constituted ineffective assistance of counsel. Furthermore, on August 23, petitioner filed a Writ of Habeas Corpus before the Florida Supreme Court alleging inadequate appellate counsel. All these allegations were restated in petitioner's Petition for Writ of Habeas Corpus, filed before this Court on August 30, 1984.[17]

■ When pleading abuse of the writ, the government must respond specifically as it has in this case. Once it does, the burden shifts to petitioner to prove he has not engaged in that conduct. *Price v. Johnston,* 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); *Paprskar v. Estelle,* 612 F.2d 1003, 1006 (5th Cir.1980). Petitioner must be allowed the opportunity to explain or rebut the abuse of writ allegation. *Potts v. Zant,* 638 F.2d 727, 747 (5th Cir.), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981). In the instant case, the petitioner requested an evidentiary hearing on this issue and one was held on September 1, 1984. Based on the hearing and record the court makes the following findings.

Rule 9(b) which governs section 2254 cases in the United States District Courts states as follows:

(b) *Successive petitions.* A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged,

---

**17.** In paragraph 15(D) of his Petition for Writ of Habeas Corpus as one of the allegations under the heading factual basis supporting relief, petitioner asserts an issue of law not addressed in his memorandum of law. Nor has he submitted any evidence to support this issue. The allegation claims that Florida's death penalty has been applied in a discriminatory manner based on the race of the victim. It was first raised after the warrant was signed by the governor. The petitioner has known of the claim, *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978), and

this Court's findings on abuse of writ would apply to said claim. In addition, because the claim was not raised in the memorandum of law that the state used to prepare their response, the state did not respond until oral argument. The state's position was that the United States Supreme Court had recently denied a Motion for Stay of Execution based on the same claim. The petitioner in his rebuttal did not contest the factual representation as to this issue.

the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

28 U.S.C. § 2254(a) [28 U.S.C.S. § 2254(a)].

■■■ This rule codifies the holding in *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). Advisory Committee note, Rule 9, Rules Governing Section 2254 Cases in the U.S. District Courts (28 U.S.C. foll. § 2254); *Smith v. Kemp,* 715 F.2d 1459, 1467 (11th Cir.), *reh'g denied en banc,* 717 F.2d 1401 (11th Cir.), *application to vacate stay denied,* —— U.S. ——, 104 S.Ct. 55, 78 L.Ed.2d 74 (1983); *Potts v. Zant,* 638 F.2d 727, 739 (5th Cir. Unit B), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981). The *Sanders* holding recognized that *res judicata* does not apply to habeas corpus proceedings. The Court determined, nevertheless, that federal courts are not powerless to protect against successive petitions. The United States Supreme Court recently underscored the need for the rule.

A pattern seems to be developing in capital cases of multiple review in which claims that could have been presented years ago are brought forward—often in a piecemeal fashion—only after the execution date is set or becomes imminent. Federal courts should not continue to tolerate—even in capital cases—this type of abuse of the writ of habeas corpus.

*Woodard v. Hutchins,* —— U.S. ——, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984) (five Justices concurring in per curiam opinion); *see also Antone v. Dugger,* —— U.S. ——, 104 S.Ct. 962, 79 L.Ed.2d 147 (1984); *Jones v. Estelle,* 722 F.2d 159 (5th Cir.1983). Citing *Woodard,* the abuse of writ was recently applied by the Eleventh Circuit to bar an untimely insanity claim. *Goode v. Wainwright,* 731 F.2d 1482 (11th Cir.1984).

Rule 9(b) delineates two classifications under which subsequent petitions for habeas corpus may be denied. The first occurs when the claims raised are not "new or different." The petitioner raises essentially the same legal arguments that he stated in his initial petition but alleges or presents new or different factual support for these claims. *In re Shriner,* 735 F.2d 1236 at 1240 (11th Cir.1984), citing *Smith v. Kemp,* 715 F.2d at 1469 (11th Cir.1983). The second occurs when the new issues presented are based on: 1) the petitioner's intentional withholding or abandonment of those issues in the earlier petition, or 2) his inexcusable neglect. *Stephens v. Kemp,* 721 F.2d 1300, 1303 (11th Cir.1983) citing *Potts v. Zant,* 638 F.2d at 740-41. Regarding the first classification,

> [A] federal court may give 'controlling weight ... to denial of a prior application for federal habeas ... relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant to the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.'

*Smith v. Kemp,* 715 F.2d at 1468 citing *Sanders,* 373 U.S. at 15, 83 S.Ct. at 1077, *cert. denied,* —— U.S. ——, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983). The Eleventh Circuit emphasized in *Smith:*

> determining whether the "ends of justice" would be served by readdressing the merits of the same contention as raised in the prior petition, we must look at objective factors, such as whether this was a full and fair hearing with respect to the first petition and whether there has been an intervening change in the law.

*Id.*

■■■ Regarding the second, "new claims" classification, a district court can excuse petitioner's omission of a claim from an earlier writ if he can prove he did not know of the "new claims" at the time of filing the earlier writ. For example, a change in the law since filing the last writ or a development in the facts which was not ascertainable before are possible grounds. *Jones v. Estelle,* 722 F.2d at 165.

When petitioner requested leave to assert three new issues, pursuant to Rule 9.600, the Supreme Court allowed the petitioner to return to the trial court for a

determination. A hearing was held before Judge Olliff on August 22, 1984. The court found these issues should have been raised before the state court on petitioner's previous Motions to Vacate. Furthermore, the court found that the claim regarding the effectiveness of counsel had been previously raised and denied in the court's order of May 1, 1984. Petitioner also on August 23, 1984, filed in the Florida Supreme Court a Petition for Writ of Habeas Corpus alleging ineffective assistance of appellate counsel. The Court denied the petition for writ on August 28, 1984. *Dobbert v. State*, 456 So.2d 424 (Fla.1984).

Petitioner's first and second new issues stated that the trial court erred in giving jury instructions. The inclusion of an instruction that petitioner could be found guilty of first degree murder if the jury found he had committed, among others, an "abominable and detestable crime against nature" was alleged improper. This first issue should and could have been raised on direct appeal. Counsel first raised the issue of jury instruction in the appeal to the Florida Supreme Court on April 25, 1974. On page 12 of his Petition for Writ of Habeas Corpus by Person in State Custody, petitioner states that the designation an abominable and detestable crime "had been declared unconstitutional *prior* to the offense herein, and had been removed from the enumerated felonies for felony murder *prior to trial.*" (emphasis added). Petitioner declares the instruction involved an unconstitutional offense prior to the trial date in 1974. This should have been raised in the 1974 appeal. On January 27, 1982, petitioner, represented then by his present counsel, Mr. Doherty, raised a jury instruction claim, but did not address this issue. Surely then, some eight years after the trial, this issue should have been raised. Since petitioner argues the instruction involved an unconstitutional offense *at the time of the trial* and was neither objected to then, nor on appeal in 1974, nor later in 1982, the trial court determined this issue did not now present a cognizable issue for a Motion to Vacate and the Florida Supreme Court affirmed.

In the second issue, petitioner stated further error regarding the court's failure to instruct the jury on the underlying offenses enumerated for felony murder. The trial court also denied this allegation because it could have been raised on direct appeal, and the Florida Supreme Court affirmed. This Court agrees. Petitioner has had ample prior opportunity to raise both issues.

Finally, petitioner claimed that Southwood was ineffective because he did not object to the instruction or to the failure of the trial court to give instructions on the elements of the underlying felony. Petitioner originally raised the subject of ineffective counsel in his appeal before the Florida Supreme Court on April 25, 1974, in issue 6(E). He again raised the issue of ineffective counsel in his second Motion to Vacate. In ruling on petitioners presentation of this issue, the trial court found:

[T]his Court has dealt with this issue at length in its 102 page order issued May 1, 1984. This Court finds that there is not justifiable excuse for not having raised all the factual allegations to support his legal challenge to the competency of his trial counsel in his previous Motion for Post Conviction Relief. Under the case law in Florida, petitioner is not permitted to litigate facts in a piecemeal fashion in order to continually reargue a legal claim which has not been decided against him in previous litigation. *Sullivan v. State*, 441 So.2d 609, 612 (Fla.1983), *Slattery v. State*, 433 So.2d 615 (Fla.3d DCA 1983).

*Dobbert v. State*, 456 So.2d 424 at 429 (Fla.1984). The Florida Supreme Court affirming the trial court and citing *Sullivan v. State*, 441 So.2d 609 held that a Motion to Vacate could be summarily denied

when it is based on grounds that have been raised in prior post-conviction motions and have been decided adversely to the movant on their merits. Sullivan's claim of ineffective assistance of counsel was clearly raised in his previous motion and was decided against him on the mer-

its. The fact that he may raise somewhat different facts to support his legal claim does not compel a different result. The Third District reached this same conclusion in *Slattery v. State*, 433 So.2d 615 (Fla.3d DCA 1983). Therein Slattery sought to set aside his conviction and sentence on the basis of a claim of ineffective assistance of counsel and that his guilty plea was coerced. The district court determined that these allegations had been raised in a prior motion and had been properly denied by the trial court. The district court correctly concluded: "In his second motion the appellant has raised different facts to support his allegation of ineffective assistance of counsel which are not permitted under existing Fla.R.Crim.P. 3.850. Therefore the order denying the appellant's motion is appropriate ...." 433 So.2d at 616. *Dobbert v. State*, 456 So.2d 424 at 429 (Fla.1984).

On page 1, footnote 1, of his Memorandum of Law in Response to Abuse of the Writ Allegation (hereinafter "Memo of Law in Response"), petitioner asserts that "the precise standard in this circuit" for abuse of writ cases has been enunciated, for example, in *In re Shriner*, 735 F.2d at 1236, which holds that grounds which have been previously raised, albeit in slightly different form may not be raised again. Petitioner may not raise and re-raise the same issues merely by developing "different arguments and conclusions." *Id.*

Following petitioner's advice to apply the standard of *Shriner*, this Court would agree with the following reasoning:

Shriner's attempt to couch the issue in ineffective assistance terms is once again unavailing. If such arguments were allowed on successive habeas petitions, every petitioner would be entitled to file and have considered successive petitions merely by alleging a substantive ground for relief in the initial petition and then, even after the initial petition is denied, by alleging in a second petition his attorney's failure to raise the substantive ground at the trial stage, claiming that

such failure constituted ineffective assistance of counsel.

*Id.* at 1240.

Once again, in his Petition for Writ of Habeas Corpus filed before the Florida Supreme Court on August 23, 1984, and in his Petition for Writ of Habeas Corpus by Person in State Custody filed before this Court on August 30, 1984, petitioner raises the issue of ineffective legal counsel. He claims he was denied the effective assistance of appellate counsel. He argues that appellate counsel was not effective because he failed to challenge on appeal a jury instruction on felony murder given by the trial court which included reference to the offense of the abominable and detestable crime against nature. He charges, furthermore, that appellate counsel failed to challenge the failure of the trial court to instruct on the elements of the underlying felony offenses.

The Florida Supreme Court found that since there was no objection at trial and no request that the instruction on elements of felony offenses be given, Dobbert's appellate counsel could have obtained review of these issues only by demonstrating that they were fundamental errors. Unless counsel could argue fundamental unfairness, not raising these issues cannot be considered a serious and substantial deficiency.

On the basis of this Court's review, to this point it would appear petitioner's new claims rise to the level of an abuse of the writ. Petitioner requested an evidentiary hearing on abuse of the writ. Although such a hearing is mandated only when there is a "substantial conflict" as to the actual facts involved, *Price v. Johnston*, 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948) this Court held a hearing September 1, 1984, because of the serious consideration necessary in a capital case.

The petitioner challenges the application of abuse of the writ's second classification which disallows successive petitions presenting grounds different from those

presented in a prior application. A difficult case is one such as this which is a mixture of the two extremes of asserting a new claim based on new facts or law, which would be admissible and the opposite extreme where petitioners are aware of a ground and deliberately withhold it, which would be barred. Petitioner must prove by a preponderance of the evidence that he has "not abused the writ." *Price v. Johnston*, 334 U.S. at 292, 68 S.Ct. at 1063. The purpose of the evidentiary hearing is to determine whether the failure to raise the new claims in the prior petition was excusable. *Jones v. Estelle*, 722 F.2d at 164.

During the evidentiary hearing on September 1, 1984, petitioner's first witness, Scharlett Holdman, Director of the Florida Clearinghouse on Criminal Justice, indicated through oral testimony and exhibits the difficulty in locating counsel for death row inmates. In 1982, twenty-three death warrants were signed and "fifteen of those people didn't have attorneys when the warrants were issued by the governor." (Transcript of Oral Argument and Evidentiary Hearing held before this Court on September 1, 1984 [hereinafter "Hearing of September 1, 1984"], p. 12, lines 22–24). After the warrant is signed, Holdman must then locate a *pro bono* attorney. She stated further that in several cases she has searched until seven or eight days prior to an execution before an attorney could be found. (Hearing of September 1, 1984, p. 14, lines 24–25).

This theme was reiterated in Mr. Doherty's Memo of Law in Response. He states, "The hectic pace imposed by the signing of a death warrant, and the lack of time available to *pro bono* counsel recruited *at the last minute* offer sufficient reason for failure to raise the issue earlier." (Memo of Law in Response, p. 13) (emphasis added).

Ms. Holdman's testimony regarding the hectic preparation of these cases may be true, but the facts of *this* case are to the contrary. Mr. Doherty testified at the September 1, 1984, hearing before this Court that he first became "involved" in the case during September of 1981, when he dis-

cussed it with Mr. White. In December of 1981, he began representation of Dobbert. (Hearing of September 1, 1984, p. 24, lines 13–16). Unlike the situations described by Ms. Holdman's testimony, and in Mr. Doherty's memorandum, he was *not* a last minute recruit. He had time to prepare for his representations. In fact, he stated that he had his "papers prepared ... ready to go the date the warrant was signed." (Hearing of September 1, 1984, p. 26, line 13). He filed the original 3.850 "virtually the day that the warrant was signed." (Hearing of September 1, 1984, p. 26, lines 13–14).

Mr. Doherty in his Memo of Law in Response asserts that "once representation occurs, a hurried motion for post-conviction relief has to be filed, with little time to even review the record." (Memo of Law in Response, p. 12). His Motion for Writ of Habeas Corpus followed and raised the identical claim. (Memo of Law in Response, p. 13). He states that those days were filled with hearings and no time was available to do substantial research or factual investigation.

Even if Mr. Doherty's representation was initially rushed, the record reflects that he has represented counsel at the following matters: (1) January 12, 1982, before the trial court on evidentiary hearing on the motion to vacate sentence; (2) January 27, 1982, before the Court on a Petition for Writ of Habeas Corpus alleging thirteen grounds; (3) January 27, 1982, Petition for Stay of Execution before this Court; (4) A Petition for Stay before the Eleventh Circuit Court of Appeal; (5) evidentiary hearing before this Court on January 29, 1984; (6) Writ of Error Corom Nobis filed before the Florida Supreme Court on February 16, 1982; (7) Second Writ of Habeas Corpus before this Court on February 8, 1982; (8) the second motion to vacate judgment and sentence filed before the trial court on June 23, 1983; (9) the subsequent hearing on this motion on October 17, 1983; (10) filed a Notice of Appeal before the Florida Supreme Court on May 30, 1984; (11) filed leave to raise

four new issues before the Florida Supreme Court.

This Court recognizes and commends Mr. Doherty's *pro bono* work. His concern and hard work are exemplary. Undoubtedly, he has been vigorously involved and committed to this case. Nevertheless, the record reflects that he did have a reasonable amount of time to prepare for his initial representation of Dobbert. Furthermore, he has continued to represent petitioner through many pleadings and hearings over a period of years. No new facts have come to light in the past year nor has new law changed the legal significance of facts he knew earlier.

An examination of petitioner's claims augers an emerging cycle. The first Petition for Writ of Habeas Corpus, filed before this Court, did not allege ineffectiveness of counsel. After the denial of this first Petition for Writ of Habeas Corpus, incompetency of trial counsel was alleged in a second Petition for Writ of Habeas Corpus and second Motion to Vacate. After the state court denied the second Motion to Vacate, the allegation of incompetency of appellate counsel was made in a third Motion to Vacate and second Petition for Writ of Habeas Corpus. Such a cycle could go on *ad infinitum* with each new counsel declaring past counsel was ineffective.

In conclusion, petitioner's claims represent the very abuse of the writ that section 2254(b) was intended to eliminate. All of his allegations either were raised or should have been raised in prior petitions for federal habeas corpus relief. Petitioner has certainly had his day in court. Full and fair evidentiary hearings were held in the trial court on January 12, 1982, concerning petitioner's Motion to Vacate and on October 17, 1983, concerning his second Motion to Vacate. A third evidentiary hearing was held with the petitioner present in this Court on January 29, 1982, to consider his Petition for Writ of Habeas Corpus and thirteen grounds for relief. Later when this Court heard petitioner's testimony on his second writ of habeas corpus on October 10, 1982, petitioner was told to return to state court and exhaust his remedies. Yet once again petitioner appears before this Court with issues not raised at that time, but which were raised after the warrant was signed. After reviewing the record including the hearing on abuse of the writ, this Court finds that Points VI, VII, and VIII should be denied, pursuant to Rule 9(b) which governs section 2254 cases.

In addition to abuse of the writ, this Court finds procedural default. All three claims, VI, VII, and VIII concern the issue of a jury instruction, the trial court's giving of a jury instruction and the failure of the trial court to give a jury instruction. This Court must first review the procedural posture of the claim to determine if it is precluded from federal habeas corpus review according to the standard enunciated in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (hereinafter "Sykes").

Florida Rule of Criminal Procedure 3.850 has been interpreted by the Florida courts as barring the consideration of claims in state post-conviction relief proceedings that could have been but were not raised on direct appeal in the state courts. *Hargrave v. State,* 396 So.2d 1127 (Fla. 1981); *Hargrave v. Wainwright,* 388 So.2d 1021 (Fla.1980); *Johnson v. State,* 390 So.2d 1234 (Fla.App.1980). *See also Alvord v. State,* 396 So.2d 184, 191 (Fla.1981); *Pittman v. State,* 401 So.2d 934 (Fla. 1st DCA 1981); *Savino v. State,* 397 So.2d 1236 (Fla. 4th DCA 1981); *Roth v. State,* 385 So.2d 114 (Fla.3d DCA 1980). The Florida Supreme Court enforces its procedural default rules in capital cases. *See Meeks v. State,* 382 So.2d 673 (Fla.1980), *aff'd,* 418 So.2d 987 (Fla.1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002 (1983); *Adams v. State,* 380 So.2d 423 (Fla.1980). *See also Ford v. Strickland,* 696 F.2d 804, 816 (11th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

In reviewing the procedural posture of the claims now before this Court, the record clearly reflects, and it has never

been contested, that they were not raised at the trial. Nor were they raised on direct appeal. Dobbert raised these new claims on August 17, 1984, in his Amended Emergency Motion for Order Permitting Trial Court to Consider Certain Matters During Pendency of this Appeal and in his Second Amendment to Emergency Motion for Order Permitting Trial Court to Consider Certain Matters During Pendency of Appeal, filed on August 20, 1984, and on August 23, 1984, in a Petition for Writ of Habeas Corpus filed before the Florida Supreme Court.

Procedural default has occurred as to these claims at the trial court. Since in this case the trial court did not reach the merits of the claim, this Court will review the Florida Supreme Court's opinion to determine whether the Florida Supreme Court reached the merits. The Florida Supreme Court in its August 28, 1984, opinion stated that the claims "were not cognizable in this proceeding because they could have been raised on direct appeal." *Dobbert v. State,* at 429. The Florida Supreme Court later in its opinion discussed the claim in its analysis of whether appellate counsel was ineffective. A fair reading of the entire opinion requires this Court to conclude that the basis of the Florida Supreme Court's ruling was the procedural default rule. *Ratcliff v. Estelle,* 597 F.2d 474, 477 (5th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). The discussion of the merits of the claim centered solely upon the issue of incompetency of appellate counsel rather than the jury instruction.

 Under *Sykes* a state court's finding of procedural default in the state court prevents a federal review of the same claim absent a showing of cause and prejudice to excuse the default. Petitioner must show "cause for" and "prejudice from" his failure to timely raise the claims. *Engle v.*

*Issac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. at 90–92, 97 S.Ct. at 2508–2509 (1977); *Sullivan v. Wainwright,* 695 F.2d 1306, 1310 (11th Cir.1983).

If allegations of cause and prejudice going to the merits were made and accepted, this Court would be required to excuse Dobbert's procedural default and consider the merits of his otherwise precluded claims. *Francis v. Henderson,* 425 U.S. 536, 542, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149 (1976). *Accord Engle v. Issac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977).

 However, neither cause nor prejudice allegation were specifically proferred or raised in petitioner's brief, memorandum or oral argument and respondent did not have the opportunity to reply. Therefore, this Court will not substitute its own version of what the argument could be.[18]

## CONCLUSION

ORDERED for the reasons stated in this Opinion, the Clerk shall enter Judgment dismissing this action.

---

18. An assertion of ineffective assistance of counsel is not sufficient because "an allegation of ineffective assistance of counsel is not sufficient to satisfy the 'cause' requirement." *Washington v. Estelle,* 648 F.2d 276, 278 (5th Cir.1981); *Lumpkin v. Ricketts,* 551 F.2d 680 (5th Cir. 1977), *cert. denied,* 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 316; *Sullivan v. Wainwright,* 695 F.2d 1306 (11th Cir.1983). However, proof of ineffective assistance of counsel may at times be sufficient to satisfy the cause requirement if properly raised. *Birt v. Montgomery,* 725 F.2d 587 (11th Cir.1984). In the instant case, petitioner has not raised the issue in this context.