SEPTEMBER 7, 1984

No. 84–5378 (A–157). DOBBERT *v.* WAINWRIGHT, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS. C. A. 11th Cir. Application for stay of execution of sentence of death, presented to JUSTICE POWELL, and by him referred to the Court, denied. Certiorari denied. JUSTICE STEVENS would grant the application for stay of execution.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The State of Florida intends to electrocute the applicant Ernest John Dobbert, Jr. in several hours. Dobbert seeks a stay of his execution pending the orderly disposition of a petition for a writ of certiorari. He raises substantial issues concerning the constitutionality of his death sentence and the proper measure of federal deference to state-court factfinding under 28 U. S. C. § 2254(d). I would grant Dobbert's application and stay his execution.

I

Dobbert was convicted in 1974 of the first-degree murder of his 9-year-old daughter Kelly. Although the jury recommended a life sentence by a vote of 10–2, the presiding judge, R. Hudson Olliff, overrode the recommendation and imposed the death sentence.

Dobbert's 13-year-old son, John III, testified at trial that he saw Dobbert kick Kelly in the stomach several times on the night before her death and that, on the subsequent evening, he saw Dobbert choke the girl until she stopped breathing. John III was "the State's key witness" at trial. *Dobbert* v. *State*, 414 So. 2d 518, 519 (Fla. 1982). There was abundant evidence that Dobbert had committed unspeakably brutal acts toward his children, but John III's testimony was the sole evidence that Dobbert had actually and deliberately strangled Kelly to death. "While the evidence presented without his testimony was adequate to convict of second-degree murder, young Dobbert's testimony supplied the

sole basis for finding premeditation. There is no doubt that Dobbert inflicted injuries that caused the death of his daughter, but only through the trial testimony of young Dobbert is there evidence of his intent to cause that death." *Dobbert* v. *State*, 456 So. 2d 424, 431 (1984) (McDonald, J., dissenting in part).

In 1982, eight years after his father had been convicted and sentenced to death, John III recanted his trial testimony. His affidavit, set forth in full as an appendix to this opinion, is direct and to the point: "I did not testify truthfully about the cause of my sister Kelly's death at the trial. . . . My father did not kill Kelly." John III stated that, in fact, the "kicking incident" had occurred two weeks before Kelly's death. With respect to the fatal night, John III now states that he remembers Kelly "sitting in bed eating some soup. She started vomiting, and then choking on her own vomit and food. My father tried to give her mouth to mouth resuscitation, but it didn't work. Kelly was not killed by my father; she died accidentally, choking on food or vomit."

Why had John III earlier testified that Dobbert choked Kelly to death? First, at the time of the trial "I was still deathly afraid of my father after all I'd been through and seen, and wanted to be sure he'd be locked up where I'd be safe from him." Second, in the time leading up to and following the trial, John III was living at a children's home in Wisconsin where he was undergoing hypnosis and kept "heavily medicated" on Thorazine. Finally, "[a]lthough no one ever said it directly," John III "knew" that the staff at the children's home "wanted me to testify that my father killed my sister. I looked up to these people and wanted desperately to please them—they were good to me and concerned about me in a way I hadn't known for years."

Dobbert has twice argued in state court that his capital conviction and sentence are unconstitutional in light of John III's perjured testimony. The first time, in connection with his request to file a petition for a writ of error *coram nobis*, the Supreme Court of Florida held that John III's recantation is not "new evidence" and therefore does not deserve judicial attention. *Dobbert* v. *State*, 414 So. 2d, at 520. The court argued that, because John III had given a statement to the police after Kelly's death which contradicted the testimony he later gave at trial, defense counsel could have cross-examined the boy at trial on the inconsistencies between the earlier statement and his testimony. *Ibid.*

The second time, in connection with a motion to vacate the conviction, Circuit Judge R. Hudson Olliff held that, even in the face of the recantation, there is no "evidence or proof" to support Dobbert's claim of perjured testimony. *State* v. *Dobbert*, No. 73–5068, p. 81 (Fla. 4th Cir. Ct., May 1, 1984), aff'd, 456 So. 2d 424 (1984). Judge Olliff, who had presided over the original trial, reviewed John III's statements to the police, deposition testimony, trial testimony, and subsequent deposition testimony in a civil proceeding. Although John III's initial statements to the police contradicted his subsequent trial testimony, Judge Olliff found that the inconsistencies were easily explained away in light of the boy's terror of the father. Judge Olliff then reviewed John III's other prerecantation statements and held that they "are all consistent and each corroborates the other." Thus, he concluded, even in the face of the recantation "it is obvious that the murder conviction was not based solely—or in part—upon perjured testimony. Nor is there any evidence or proof to support [Dobbert's] allegation of perjury." *State* v. *Dobbert*, No. 73–5068, at 81. Judge Olliff made this conclusion without any discussion or analysis of John III's recantation. The Supreme Court of Florida affirmed, holding that Dobbert's claim of perjury is "without merit" because "there is no evidence or proof to support present counsel's allegation of perjury." 456 So. 2d, at 429.

Dobbert then filed a successive petition for federal habeas relief in the United States District Court for the Middle District of Florida. Although there is no question that Dobbert was not abusing the writ on this issue—John III's recantation had come *after* Dobbert's first federal petition had been denied—the District Court denied the petition because Judge Olliff had found that "even in light of the 1982 recantation John's trial testimony was not perjured. Judge Olliff found, instead, that there was 'no evidence or proof to support [petitioner's] allegation of perjury.'" 593 F. Supp. 1418, 1427 (1984). This finding, the District Court concluded, commands deference under 28 U. S. C. § 2254(d). See *Sumner* v. *Mata*, 449 U. S. 539 (1981). The Eleventh Circuit has now affirmed 2–1. 742 F. 2d 1274 (1984) (Clark, J., dissenting).

## II

Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very

often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will "render probable a different verdict." See, *e. g.*, *Brown* v. *State*, 381 So. 2d 690, 692–693 (Fla. 1980).

Dobbert argues that, notwithstanding the strong presumption against recanting testimony, the circumstances of John III's recantation in this capital case raise important constitutional issues that demand sober and measured reflection. First, although federal courts traditionally have held that a conviction supported by perjured testimony is not unconstitutional unless the prosecutor or judge knew or had reason to know that the testimony was perjured, Dobbert argues that this approach is no longer valid after *Jackson* v. *Virginia*, 443 U. S. 307 (1979). Dobbert correctly notes a split among the Circuits concerning the authority of federal courts to grant habeas relief when "newly available evidence conclusively shows that a vital mistake ha[s] been made." *Grace* v. *Butterworth*, 586 F. 2d 878, 880 (CA1 1978). Compare *Grace* (such claims are cognizable); *United States ex rel. Sostre* v. *Festa*, 513 F. 2d 1313 (CA2) (same), cert. denied, 423 U. S. 841 (1975), with *Drake* v. *Francis*, 727 F. 2d 990 (CA11 1984) (such claims are not cognizable because habeas is not concerned with questions of guilt or innocence), rehearing en banc granted, *id.*, at 1003.

Second, Dobbert argues that the federal courts should give attention to formulating proper standards for evaluating the materiality and credibility of recantations. He notes that the need for such consideration is especially great where, as here, the recanted testimony was the *sole* evidence supporting a conviction of first-degree murder.

Dobbert argues finally that, whatever the usual procedural rules regarding the consideration of a recantation, those rules must bend in the face of the Eighth Amendment. He notes that this Court has repeatedly invalidated procedural rules that "'diminish the reliability of the guilt determination'" in capital cases, Application for Stay of Execution 16, quoting *Beck* v. *Alabama*, 447 U. S. 625, 638 (1980), and argues that Eighth Amendment scrutiny should be applied to rules barring postconviction reconsideration of guilt as well as to procedural rules employed at trial.

However we ultimately might resolve these issues after research, argument, and reflection, they certainly are not frivolous. Yet the federal courts are about to let Dobbert go to the electric chair out of misplaced deference to an unexplained, and palpably inexplicable, state-court "factual" finding that there is, in fact, no "evidence or proof" to support his claim of perjury.

## A

If Judge Olliff's "finding" that there is no "evidence" of perjury found fair support in the record, the law would mandate that the federal habeas court defer to that finding. 28 U. S. C. § 2254(d); see *Sumner* v. *Mata, supra.* But no fair-minded person could conclude on the basis of the record before us that the "finding" is plausible. It is absurd on its face. Dobbert has offered stark "evidence" of perjury—the recantation affidavit of John III. Rather than analyzing *that* evidence for its strengths and weaknesses, Judge Olliff reviewed John III's *previous* statements— statements which John III now recants—and on finding that *those* statements "are all consistent and each corroborates the other," proceeded to conclude that notwithstanding the recantation "it is obvious that the murder conviction was not based solely—or in part—upon perjured testimony. Nor is there any evidence or proof to support [the] allegation of perjury."

This "factual determination" should not stand because it most certainly is *not* "fairly supported by the record." 28 U. S. C. § 2254(d)(8). Some may choose to argue that Judge Olliff's "finding" represents an implicit rejection of the materiality and credibility of John III's recantation. Perhaps it does. Cf. *LaVallee* v. *Delle Rose*, 410 U. S. 690, 697 (1973) (in the "ordinary case," federal courts may assume that a state court which did not articulate its reasoning fairly considered the merits of the factual dispute). But Judge Olliff's asserted reasoning—that earlier statements were consistent with each other, thereby demonstrating the absolute lack of *any* "proof or evidence" of perjury—is not entitled to deference where the recantation asserts that those statements were untrue. There may well be numerous reasons why John III's recantation should not be entitled to controlling weight, but there is nothing here to suggest that Judge Olliff considered those possible reasons, let alone relied upon them in reaching his conclusion. In the face of a specific recantation of critical testimony, a court must evaluate the recantation itself and explain what it is

about that recantation that warrants a conclusion that it is not credible evidence.

That Judge Olliff's rejection of the recantation was not based on any evaluation of the recantation itself is demonstrated, I believe, by the District Court's opinion. The court made an urgent effort to demonstrate that Judge Olliff's finding was related to a consideration and analysis of the recantation itself, noting, for example, that "Judge Olliff reviewed the facts depicted in John's [earlier testimony] and determined that they were much more detailed than . . . the 1982 recantation. (Olliff's Order at 63, 67)." 593 F. Supp., at 1427. Nothing in the cited pages supports the District Court's characterization of Judge Olliff's analysis; the recantation is not even mentioned in these pages. In fact, nowhere in the order does Judge Olliff compare the earlier testimony with the recantation.

The proper analysis under § 2254(d), I submit, is illustrated by a case cited with approval in *Sumner* v. *Mata* itself, see 449 U. S., at 547–548. In *Taylor* v. *Lombard*, 606 F. 2d 371 (CA2 1979), cert. denied, 445 U. S. 946 (1980), defense counsel came forward after the state conviction with an affidavit charging that key testimony had been perjured and that the prosecution nevertheless had knowingly used it. In a post-trial proceeding the state court concluded that there was "no showing" of perjured testimony. 606 F. 2d, at 374. The Second Circuit reviewed the record and concluded that the state court's finding that "there was no factual basis for the claim of perjury is not fairly supported by the record, and therefore is not entitled to deference." *Id.*, at 375. The Second Circuit's requirement of fair support in the record was not, of course, an exercise of judicial fiat—it was required by Congress in 28 U. S. C. § 2254(d)(8). I cannot comprehend how the federal courts in this capital case can in good conscience avoid that statutory command.

I emphasize again that John III's recantation ultimately may not deserve controlling weight. But such a conclusion cannot rest upon a finding that there is no "evidence or proof" of perjury at all, especially when that clearly erroneous finding is coupled with a complete failure to analyze the recanting evidence *itself*.*

---

*It might be argued that the State Supreme Court's earlier determination that John III's recantation is not "new evidence," *Dobbert* v. *State*, 414 So. 2d 518, 520 (Fla. 1982), now serves as a procedural bar to federal review. That

## B

The strong presumption against recantation testimony reflects an uneasy balance between, on the one hand, society's interest in resolving factual disputes in one proceeding and in according finality to those resolutions, and, on the other, the interests of a convicted individual and society at large in ensuring that only the guilty are punished. However the balance is ultimately struck in the ordinary criminal case, the Eighth Amendment requires that courts—state and federal—strike a special balance in the capital context. "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson* v. *North Carolina*, 428. U. S. 280, 305 (1976). See also *Beck* v. *Alabama*, 447 U. S., at 638 (normal procedural rules must give way in the capital case where they "diminish the reliability of the sentencing determination"). For this reason, the Court historically has taken special care to minimize the risk that death sentences are "imposed out of whim, passion, prejudice, or mis-

finding should not preclude the federal courts from considering the merits of Dobbert's claim. First, the state courts themselves have failed to abide by the finding. Judge Olliff professed to consider the recantation itself and concluded that there was no "evidence or proof" of perjury, and the Supreme Court of Florida affirmed on those grounds.

Second, as Judge Olliff himself found, there were compelling reasons why Dobbert could not effectively have used John III's initially inconsistent statements to the police at trial: The inconsistencies, such as they were, could easily have been explained away; John III might well have broken down under such questioning, thereby further inflaming the jury; and such questioning would almost certainly have led to a "parade of horribles" concerning Dobbert's abuse of his children.

Finally, I believe it manifest that John III's 1982 recantation is "new" evidence. It seems obvious that it is much more powerful for John III now to state that his father did not kill his sister than it was when the boy first suggested this in 1972. At that time, John III clearly was terrified of his father and was living in a nightmare world, both of which (as Judge Olliff found) probably would have led a jury to discount the inconsistencies as part of the boy's effort to protect himself. Now that John III is a grown man and is willing to recant his trial testimony—when he has no reason to fear his father and has, we can only hope, recovered from the trauma to which he was subjected—his statements carry much more powerful force. Thus the recantation is not merely duplicative of the earlier statement.

take." *Eddings* v. *Oklahoma*, 455 U. S. 104, 118 (1982) (O'CON-NOR, J., concurring).

In the face of a sworn recantation from the only witness who provided testimony supporting Dobbert's conviction of first-degree murder, are we confident that there has been a reliable factual determination of his guilt, sufficient to warrant public confidence in the outcome as he proceeds to the electric chair? I believe there are compelling reasons to stay Dobbert's execution while we give this question further thought. First, no federal court addressing Dobbert's claim has yet even attempted to analyze the appropriate ground rules for considering the materiality and credibility of John III's recantation. As Dobbert has demonstrated, these are open issues that sooner or later will require our attention. Second, the sole reason for this failure has been the federal courts' mistaken invocation of 28 U. S. C. § 2254(d) in relying on Judge Olliff's "finding" that in the face of the recantation admitting perjury there is no "evidence or proof" of perjury. In the "ordinary case" it may well be appropriate to engage in all manner of tidy assumptions about what Judge Olliff "really" meant to say. Cf. *LaVallee* v. *Delle Rose*, 410 U. S. 690 (1973). But this is no ordinary case. I must conclude at this juncture that there is *no* fair support in the record for the "finding" that there is no "evidence or proof" of perjury where (a) the "finding" is absurd on its face, and (b) the "finding" has been made without *any* discussion of the merits of the recantation itself. I would submit that what really is going on in this case can be gleaned from Judge Olliff's introduction to his opinion: "This case has been pending for a longer period of time than this nation was involved in World War II and the Korean War combined." *State* v. *Dobbert*, No. 73–5068, at 2. In the face of such impatience, I believe that *any* confession by John III to perjured testimony, however strong, would in the end have made not one bit of difference.

## III

I continue to adhere to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting), and would therefore grant the application in this case. But even if I believed otherwise, I would stay the execution to permit for a fair and rational consideration of Dobbert's claims.

Only two men know whether Kelly Dobbert was strangled or whether she accidentally choked to death. One of them will die in several hours. The other will live with the consequences of his damning testimony for the rest of his life. Both now swear that the testimony was false. I would have thought that the federal courts would take the time to ensure that John III's recantation truly deserves no weight, or at the very least that it has received principled consideration in the state courts. This is not another mere example of "ordinary" deference to state-court factfinding. It is an outright abdication of our responsibility to minimize the risk that innocent people are put to death.

I dissent.

## APPENDIX TO OPINION OF BRENNAN, J., DISSENTING

COUNTY OF EAU CLAIRE

STATE OF WISCONSIN

### AFFIDAVIT

Ernest John Dobbert, III, being first duly sworn, deposes and says:

1. I am the son of Ernest John Dobbert, Jr., who was convicted and sentenced to death in Jacksonville, Florida in April, 1974, for the murder of my sister, Kelly Ann Dobbert. I testified as a witness against my father at his trial. I did not testify truthfully about the cause of my sister Kelly's death at the trial.

2. On Sunday, January 31, 1982, I read in the newspaper that my father was to be executed within two days. After learning of my father's execution date, I called my close personal friend and lawyer, Paul Kelly, and asked him to help me correct my untrue testimony that was responsible for my father being convicted of murdering Kelly.

3. Some of the questions asked of me at trial by Mr. Shorstein, the Assistant State Attorney, are listed below. The answers in the left column are some of the answers given at trial that were false. The true answers are listed on the right under the column designated "Correct Answer."

> Question: "Let me go back to the night before New Year's Eve. Did he [your father] do anything to Kelly the night before she died?" [T.T. 2113]

| Answer at trial: | Correct Answer: |
|---|---|
| "Yes." | "No." |

Question: "What did he do to her?" [T.T. 2113]
Answer at trial:         Correct Answer:
"Kicked her."            "Nothing."

The answers indicating that my father kicked Kelly the night before she died were untrue. My father did kick Kelly in much the way I described, but weeks before she died.

Question: "Did he [your father] do anything to her [Kelly] the night she died?" [T.T. 2113]
Answer at trial:         Correct Answer:
"Choked her."          "No."

All the answers indicating my father choked Kelly the night she died are untrue. He did not choke her that night, nor did he kill her. Her death was accidental.

4. I am making this affidavit because there are statements I made at trial that were untrue, and need correcting. I do not make this affidavit out of any great love for my father. I still have not forgiven him for the abuse that I (and my brother and sisters) suffered at his hands for the four years before Kelly died and I ran away. I have no desire to see him free. He should be in prison for the abuse to his children.

5. I read my testimony at trial again recently. Although it is accurate in parts, there are statements that are clearly false, and parts of the story came out in a way that is very misleading about what happened before Kelly's death. The story as it came out is just untrue. The trial testimony creates this story: The night before Kelly died, my father kicked her several times in the stomach. The next night, after she ate some soup, he choked her and she stopped moving. I listened to her heart, but couldn't hear a beat. My father then tried mouth to mouth resuscitation, but it didn't work.

What happened in reality was that the kicking incident occur[r]ed long before the night Kelly died, more like two weeks before she died. The night she died, she was sitting in bed eating some soup. She started vomiting, and then choking on her own vomit and food. My father tried to give her mouth to mouth resuscitation, but it didn't work. Kelly was not killed by my father; she died accidentally, choking on food or vomit.

6. I'd like to explain a little more about why I think I testified as I did at the trial, and why I'm taking action to correct it now.

At the time of the trial I was thirteen years old. I was still deathly afraid of my father after all I'd been through and seen, and wanted to be sure he'd be locked up where I'd be safe from him. I was undergoing hypnosis in a psychologist's office in Wisconsin for about a year before the trial. (The therapy ended one month after the trial.) I was hypnotized approximately two times a week for a period of time, and then about once every week thereafter. At each session, I'd be hypnotized and then asked questions about my father and how he abused us. I was later kept heavily medicated on what I was told was Thorazine, from 1972 to 1976, and then on other medication until 1978.

Although no one ever said it directly, I knew that my social worker, Mrs. Lenz, and other people on the staff at the children's home wanted me to testify that my father killed my sister. I looked up to these people and wanted desperately to please them—they were good to me and concerned about me in a way I hadn't known for years. Mrs. Lenz, in particular, influenced me. I saw her almost every day for the period before the trial. She developed some emotional difficulties herself, and began to obsess about my father.

When I finally left the institutions in 1978 and came off the medication, I thought about what I had done in testifying that Kelly was murdered when she died accidentally. Although I knew I had done something wrong, I wasn't sure what, if anything, I wanted to do about it. After awhile, I spoke to Paul Kelly, and asked him to locate and notify my father's attorneys to see what might be done. I now want to make it known that I did not testify truthfully at my father's trial, as this affidavit shows. My father did not kill Kelly.

ERNEST JOHN DOBBERT, III

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

I

The "right" of the State to a speedy execution has now clearly eclipsed the right of an individual to considered treatment of a substantial claim that he has been sentenced to death for an offense that he did not commit. Ernest John Dobbert, Jr., raised such a claim in a federal habeas corpus petition filed on August 30, 1984, and here is the entire history of the deliberate speed with which the claim was considered: On September 3, the Federal

District Court for the Middle District of Florida denied relief, 593 F. Supp. 1418 (1984), but issued a certificate of probable cause to appeal, thereby indicating that Dobbert's petition had significant merit; three days after that, on September 6, the Court of Appeals for the Eleventh Circuit in a 2–1 vote affirmed the District Court's judgment, 742 F. 2d 1274 (1984), with the dissenting judge pleading that "there has not been enough time in which justiciably [sic] to decide this case;" and that very same day, at 4:40 p. m., Dobbert filed a stay application with this Court. That application asked the Court to stay his execution just long enough so that Dobbert's counsel could pause to brief properly the substantial constitutional issue raised by this case. But at 10 a. m. the next day—a scant 19 hours after Dobbert asked this Court to consider his claim and a mere 8 days after the claim was first brought before any court—Dobbert is to be executed. This is swift, but is it justice?*

There is substantial reason in this case to think it is not. Dobbert was convicted under Florida law of child abuse, child torture, second-degree murder, and the first-degree murder of his 9-year-old daughter; only the last of these carries with it the possibility of a death sentence. It is impossible to know, however, whether Dobbert actually committed the offense of first-degree murder as defined by Florida law, for the jury's verdict on this count was infected by the trial judge's repeated and invalid instruction on the scope of first-degree murder. The instruction at issue told the jury that it could convict for first-degree murder if it found that the daughter was killed by premeditated design *or* that she was killed *without premeditation* but while Dobbert was committing an "abominable and detestable crime against nature." As

---

*The frenzied rush to execution that characterizes this case has become a common, if Kafkaesque, feature of the Court's capital cases. See, *e. g.*, *Wainwright* v. *Adams*, 466 U. S. 964, 965 (1984) (MARSHALL, J., dissenting) (noting the Court's "indecent desire to rush to judgment in capital cases"); *Woodard* v. *Hutchins*, 464 U. S. 377, 383 (1984) (BRENNAN, J., dissenting) (criticizing "rush to judgment" in Court's decision to vacate stay of execution); *Autry* v. *Estelle*, 464 U. S. 1, 5 (1983) (STEVENS, J., dissenting) (criticizing decision to deny stay of execution); see also *Autry* v. *McKaskle*, 465 U. S. 1085 (1984) (MARSHALL, J., dissenting); *Woodard* v. *Hutchins*, 464 U. S., at 383 (WHITE and STEVENS, JJ., dissenting); *id.* at 383–384 (MARSHALL, J., dissenting); *Barefoot* v. *Estelle*, 463 U. S. 880, 906 (1983) (MARSHALL, J., dissenting).

a matter of state constitutional law, the Florida Supreme Court, in a holding that preceded the crimes for which Dobbert was convicted, had held that the statutory term "crime against nature" is too vague to sustain a conviction. *Franklin* v. *State*, 257 So. 2d 21, 22 (1971). Dobbert was therefore found guilty after a felony-murder instruction that permitted the jury to convict him of a crime that did not exist under state law at the time of his conviction.

The jury was thus granted impermissible leeway in violation of Dobbert's federal due process rights. This fundamental defect occurred when the trial judge—no fewer than six times during the instruction phase—instructed the jury with one variant or another of the following words:

> "If a person has a premeditated design to kill one person . . . he is . . . guilty of murder in the first degree. The killing of a human being in committing, or in attempting to commit any arson, rape, robbery, burglary, abominable and detestable crime against nature or kidnapping is murder in the first degree *even though there is no premeditated design or intent to kill.*" Tr., as printed in Record, Exhibit 5, p. 162 (emphasis supplied).

It is vital to understand what is put at stake by this definition of first-degree murder. First, the record offers no suggestion that the death of Dobbert's daughter occurred during an arson, rape, robbery, burglary, or kidnaping—the only underlying felonies upon which Florida has predicated the crime of felony murder and the capital penalty that attaches to it. Second, the trial judge gave no narrowing definition of the "crime against nature," and even if he had, there appears again to be absolutely no evidence that Dobbert's daughter died while Dobbert was sodomizing her— presumably the core offense to which the vague statutory term applies. See *Franklin, supra.* Third, there *was* ample evidence that Dobbert beat his daughter, and there was testimony that he kicked her in the stomach the night that she died.

From these facts it is quite plausible that the jury relied on the very vagueness for which the Florida Supreme Court had already struck down the statute to conclude that, even if Dobbert had not premeditated the killing of his daughter, he nonetheless should be convicted of first-degree murder for child abuse leading to death. I do not now question whether a State *could* create such a crime,

1244

but the indisputable fact is that Florida has not chosen to do so. Nor, as a corollary, has Florida chosen to make such an offense a capital one. Yet the jury in this case was not only permitted but invited six times to define a new capital crime to fit Dobbert's offense. This leeway, resulting from statutory vagueness, was the very defect inherent in the statutory term for which the Florida Supreme Court invalidated it.

There is simply no way to tell upon which theory—premeditation or felony murder based on a nonexistent predicate offense—the jury relied. Indeed, when the jury specifically requested to be reinstructed on the definitions of first- and second-degree murder, the trial judge compounded the error by repeating the invalid instruction: "Now, murder in the first degree is the unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, abominable and detestable crime against nature or kidnapping." Tr., as printed in the Record, Exhibit 5, p. 184.

This is clearly error of federal constitutional magnitude. In *Stromberg* v. *California*, 283 U. S. 359 (1931), the Court announced a rule from which we have not since departed: "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant* v. *Stephens*, 462 U. S. 862, 881 (1983). It is also clear that *Stromberg* applies to state criminal proceedings, for *Stromberg* itself involved a state conviction. See also *Williams* v. *North Carolina*, 317 U. S. 287, 292 (1942); cf. *Zant, supra,* at 891–893 (WHITE, J., concurring in part and concurring in judgment) (*Stromberg* applies when jury was invited to convict on two or more grounds, one of which was not sufficient to sustain the conviction). Moreover, the State essentially concedes that *Stromberg* error was committed, for the State does not argue that there was sufficient evidence of any form of felony murder recognized by Florida law.

The real question at this stage is whether this error—which goes to the question whether Dobbert was actually found guilty of first-degree murder—casts a serious enough doubt on the integrity of the jury's verdict that the error is still reviewable at this stage of the proceedings. The instruction was not objected to at

trial, nor was the erroneous instruction raised in Dobbert's first federal habeas petition. Citing these procedural derelictions of Dobbert's counsel, the courts below—both state and federal—have refused to consider the merits of the alleged *Stromberg* violation.

There are sound arguments that the alleged violation in this case is so fundamental that neither *Wainwright* v. *Sykes*, 433 U. S. 72 (1977), nor the abuse-of-the-writ doctrine ought to be applied to allow Dobbert's execution to take place before this Court is at least provided with focused briefing. The Court has recognized that the cause-and-prejudice standard must be applied in such a way that fundamental "miscarriage[s] of justice" will meet it, see *id.*, at 91; as JUSTICE STEVENS noted in his concurrence in *Wainwright*, "if the constitutional issue is sufficiently grave, even an express waiver by the defendant himself may sometimes be excused." *Id.*, at 95. Similarly, *Sanders* v. *United States*, 373 U. S. 1, 15 (1963), makes clear that a federal court may consider even claims raised and decided in a previous habeas petition "if the ends of justice" would thereby be served; surely the same standard or a lesser one should apply to a successive petition that raises a *new* claim, at least when that claim casts significant doubt on a defendant's guilt. See *Sanders, supra*, at 18–19 (A "federal judge clearly has the power—and, if the ends of justice demand, the duty—to reach the merits" of certain claims raised for the first time on a successive habeas petition). Lower federal courts in settings similar to the one here have applied these principles to review fundamental trial errors to which timely objections have not been made. See, *e. g., Adams* v. *Murphy*, 653 F. 2d 224, 225 (CA5 1981) (reversing conviction based on nonexistent state crime despite absence of trial objection to instruction). When, as in this case, the question is the fundamental one of guilt or innocence on the indicted charge, and the case is a capital case, the argument is strong that the "ends of justice" and fundamental "miscarriage of justice" standards have been met. I would allow Dobbert to make that argument in a certiorari petition.

As the United States District Court for the Middle District of Florida acknowledged, this is a "difficult case" with regard to the question of whether the abuse-of-the-writ doctrine should apply. 593 F. Supp., at 1440. We need not resolve that "difficult" issue today, however, to decide the only issue before the Court on this stay application: whether that claim is "difficult enough" and potentially worthy enough of the Court's attention that a stay of

the execution ought to be granted until certiorari papers can be filed and the Court can make a considered evaluation of the argument. Put another way, the question is whether there is a significant claim that the State cannot execute Dobbert on the basis of a conviction that may be constitutionally invalid—with respect to an issue affecting guilt or innnocence—merely because Dobbert's attorneys have not made timely objections on the point.

In sum, there is no question that Dobbert abused and tortured his children, but there is a serious question as to whether the defect in the instruction allowed the jury to bypass the question of premeditation by concluding that the girl's death resulted from Dobbert's callous and reckless beating of her. That may well make Dobbert guilty of second-degree murder in Florida, but it cannot make him guilty of first-degree murder there. Nor can it subject him to the death penalty in that State. Dobbert is certainly no innocent man, but he may well be a guilty one to whom Florida's legislators have not chosen to apply the death penalty.

## II

Because I continue to adhere to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 231 (1976), I would in any event grant the stay application and vacate the death sentence. But I am deeply troubled by the undue dispatch with which a majority of this Court is willing to send this stay applicant, as well as a host of others, see n., *supra*, to their death. In the case of an applicant like Dobbert, who raised a substantial claim going to the question of whether he committed a capital offense, the majority's haste is particularly disquieting.