**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 15, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KENT ERIC LEBERE,

     Petitioner - Appellant,

v.

TRAVIS TRANI, Warden; THE
ATTORNEY GENERAL OF THE STATE
OF COLORADO,

     Respondents - Appellees.

No. 16-1499
(D.C. No. 1:03-CV-01424-MSK-MEH)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **BACHARACH**, Circuit Judges.
_____

Kent LeBere appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition. We conclude that the district court took an improperly narrow view of the evidence LeBere claims the government improperly withheld. See Brady v. Maryland, 373 U.S. 83 (1963). Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I

## A

Around 2 a.m. on the morning of October 16, 1998, witnesses reported a burning van inside a self-serve carwash stall in Colorado Springs. Police and firefighters arrived on the scene within minutes. After extinguishing the blaze, they discovered a badly burned body between the front seats. A subsequent investigation revealed that the fire was intentionally set, and that the victim, Linda Richards, had been strangled before the fire began. Spermatozoa were discovered, but were not sufficient to conduct DNA testing.

Detective J.D. Walker was the lead detective for the Richards investigation. After identifying the body, investigators contacted her fiancé, Russell Herring. Herring told police that he had last seen Richards at approximately 7 p.m. the prior evening. The couple had an argument and Richards left "in a hysterical manner." Police learned that Richards spent much of the night at Crazy Mike's Bar.

A bartender reported that Richards was drinking and playing pool with a man later identified as LeBere at the bar for several hours. At one point, the bartender asked him if he was going to "get lucky," and LeBere responded that he and Richards "were talking about a one night stand," but "Richards did not believe in one night stands." When the two left together at about 12:30 a.m., LeBere told a bartender that Richards was giving him a ride home. That bartender later assisted police in preparing a composite sketch.

Police also obtained a surveillance video from a convenience store near the crime scene. A bartender identified LeBere in the video at approximately 2:35 a.m. An employee of the convenience store recalled that he saw a cab in the parking lot shortly after LeBere left. Investigators learned from a cab company that LeBere had been picked up at 2:45 a.m. and dropped off a short distance from his residence. Officers canvassed that area with the composite sketch and eventually arrested LeBere.

When interviewed by police, LeBere admitted that he was with Richards at Crazy Mike's Bar. He initially claimed that he left the bar alone, but later stated that he left with Richards and that she gave him a ride home. LeBere was charged with first degree murder after deliberation and felony murder.

At trial, two employees of Crazy Mike's Bar identified LeBere. The convenience store video of LeBere was played for the jury. A woman who lived near the car wash testified that she saw LeBere walking past her house shortly after 2:00 a.m. A cab driver testified that he knew LeBere was the individual he picked up from the convenience store after he saw a photo of LeBere on television news. The government introduced testimony regarding LeBere's inconsistent statements to police, and LeBere's aunt testified that he told her that Richards was driving him to another bar when he felt sick and took a cab home. LeBere had his hair cut the day after the murder.

The government also offered testimony from a jailhouse informant, Ronnie Archuleta. Archuleta was housed with LeBere prior to trial. On October 26, 1998,

3

Archuleta reported to Deputy Brian Dey that LeBere had confessed to him. Dey wrote a report indicating that LeBere told Archuleta he burned the van because he had sex with Richards in the vehicle before she was killed. Detective Walker, who knew Archuleta from previous encounters, met with Archuleta on October 28, 1998. Walker relayed Archuleta's account at trial, stating that LeBere confessed that he met Richards in a bar, she gave him a ride home, he had sex with her, then panicked and choked her before driving to the car wash and burning the vehicle to destroy any evidence. According to Walker, some of the information Archuleta reported would only be known to the killer. Archuleta's testimony at trial was consistent with that report. Archuleta also stated that Walker promised to talk to the district attorney about one of Archuleta's pending cases, and that he ultimately was given a deal, receiving probation on that case.

LeBere's primary defense theory was that law enforcement had prematurely narrowed its investigation. He noted that police interviewed two homeless men camping near the car wash on the night of the murder, but failed to investigate them as potential suspects. A woman contacted police because she saw a van at the carwash just before 2 a.m., with a man standing nearby who did not match LeBere's description. She did not identify LeBere in a photo lineup or in the convenience store video.

LeBere argued that Richards' fiancé, Herring, should have been treated as a suspect. Herring admitted that police had been called to the home he and Richards shared, that their fights became "physical," that he slapped Richards on one occasion

4

hard enough that she went to the emergency room, and that he once pushed her van out of the driveway with his vehicle after a fight. Herring told police that he had not left home on the night of the murder. But a neighbor reported to police that he thought he heard a pickup truck backing over a curb near Herring's house that night. Police never called back. Richards' father testified that he saw condensation or dew on Herring's truck at about 6:30 a.m. the morning after the murder. But an expert testified that meteorological conditions that morning could not have caused dew to form, and thus the moisture was likely caused by someone having been inside the vehicle.

The defense also sought to undermine Archuleta's credibility. Walker conceded that he previously described Archuleta as a chronic liar. The jury learned of Archuleta's three prior felony convictions. And Archuleta admitted that LeBere had been warned by another inmate not to talk to him because he was a "snitch."

A jury found LeBere not guilty of first degree murder, felony murder, and manslaughter, but convicted him of second degree murder and arson. He was sentenced to sixty years' imprisonment.

**B**

While LeBere's direct appeal was pending, Archuleta contacted LeBere's attorney and recanted his trial testimony. He claimed that Walker had given him information about the murder and induced him to fabricate a confession. LeBere moved for a new trial based on the recantation. Archuleta refused to appear at a

5

hearing on that motion because he believed he would be jailed on other charges. The state court denied a new trial.

LeBere then filed a § 2254 petition in federal court, but subsequently moved to stay the petition while he exhausted state court remedies. The state courts denied relief. As to his Brady claim relating to Walker and Archuleta, the state court concluded that it raised the same issue that was previously rejected in LeBere's motion for a new trial. LeBere then returned to federal district court, where the Brady claim was denied as procedurally barred. However, we reversed that determination on appeal, holding that if "a state court refuses to adjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted." LeBere v. Abbott, 732 F.3d 1224, 1230 (10th Cir. 2013) (quotation omitted).

On remand, both Archuleta and Walker were deposed. Archuleta testified that LeBere never made any confession. Instead, Archuleta claimed that Walker wanted him to get information on LeBere's case, and after he was unsuccessful in doing so, Walker showed him LeBere's case file. With information provided by Walker, Archuleta concocted a false confession story in exchange for lenient treatment in his own case. According to Archuleta, Walker knew that the information provided came from police reports rather than LeBere, but Walker instructed him to testify that LeBere was the source. Walker again testified that Archuleta reported LeBere's confession to him.

A magistrate judge recommended denying LeBere's petition on the ground that Walker's testimony was more credible than Archuleta's. The district court denied relief on different grounds. It concluded that LeBere's claim based on perjured testimony failed because he had not shown that the prosecutor was aware of the alleged perjury. As to his Brady claim, the district court asked two questions: "1) was the verdict dependent upon Mr. Archuleta's testimony, and 2) was the impeachment evidence necessary to raise doubt as to the veracity of Mr. Archuleta's testimony?" Answering both questions in the negative, it concluded that the Brady evidence was not material. LeBere timely appealed, and we granted a certificate of appealability.

## II

Because LeBere's Brady claim was not decided on the merits in state court, the government concedes that AEDPA deference does not apply. See Romano v. Gibson, 239 F.3d 1156, 1171 (10th Cir. 2001). "[W]e review the district court's legal conclusions de novo and its factual findings, if any, for clear error." Mitchell v. Gibson, 262 F.3d 1036, 1045 (10th Cir. 2001).

To prevail on a Brady claim, a petitioner must show: "(1) the government suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." United States v. Reese, 745 F.3d 1075, 1083 (10th Cir. 2014). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469 (2009). "[A] showing of materiality does not require

7

demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Instead, material evidence is that which "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. We evaluate materiality in the context of the entire record. Moore v. Gibson, 195 F.3d 1152, 1182 (10th Cir. 1999).

LeBere frames his challenge as two distinct subclaims related to Archuleta's recantation. First, he contends that the government suppressed evidence that Walker and Archuleta conspired to manufacture a false confession. Second, he argues that Walker and Archuleta committed perjury by testifying to the contrary.

As to the latter subclaim, LeBere argues that the district court mischaracterized his Brady argument as one arising under Napue v. Illinois, 360 U.S. 264 (1959). "A Napue violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." United States v. Garcia, 793 F.3d 1194, 1207 (10th Cir. 2015).[1] LeBere has not advanced evidence suggesting that the prosecution was aware of the alleged perjury. But he argues that such evidence was unnecessary because he is seeking relief under Brady, not Napue. We have previously stated that "[a] defendant may have a Brady claim if the . . . prosecution did not correct testimony that it should have known was

[1] The standard for materiality under Napue differs from the standard under Brady. Perjured testimony is material under Napue "unless failure to disclose it would be harmless beyond a reasonable doubt." United States v. Bagley, 473 U.S. 667, 680 (1985).

8

false." Garcia, 793 F.3d at 1207. And because Walker was a police officer, LeBere contends that Walker's knowledge of the claimed perjury is imputed to the prosecution under ordinary Brady principles. See Moore v. Gibson, 195 F.3d 1152, 1164 (10th Cir. 1999) ("Knowledge of police officers or investigators will be imputed to the prosecution.").

In this case, we do not need to resolve any tension between Napue and Brady, or determine whether police knowledge of perjury is imputed. See Briscoe v. LaHue, 460 U.S. 325, 327 (1983) (noting that a "prosecutor's knowing use of perjured testimony violates due process," but the Supreme Court "has not held that the false testimony of a police officer in itself violates constitutional rights"). We conclude that the evidence allegedly not disclosed—that Walker induced Archuleta to concoct a false confession by providing him details about the crime—is material regardless of the subsequent perjury. Accordingly, we have no need to address LeBere's second subclaim.[2]

As noted above, the district court analyzed LeBere's claim by asking whether the verdict was dependent on Archuleta's testimony and whether the suppressed evidence was necessary to impeach Archuleta. But the Supreme Court has explained

---

[2] LeBere's two subclaims are necessarily linked. He contends: (1) Walker fed Archuleta information to concoct a false confession, and then (2) they lied about having done so. The second contention cannot be true unless the first is also true. Accordingly, at this point in the litigation, LeBere cannot prevail on subclaim two without also prevailing on subclaim one. That is, as described in Part III, infra, the district court will either find that Archuleta's testimony is not credible (in which case both subclaims fail), or it will find that Archuleta is credible (in which case it will grant habeas relief). In neither scenario would our resolution of the second subclaim effect the ultimate outcome.

that "[o]ne does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 434-35. We agree with LeBere that the district court took an improperly narrow view of the impact the suppressed evidence could have had.

In addition to undermining Archuleta's credibility, the suppressed evidence would have strongly supported LeBere's theory that police had conducted an insufficient investigation. If Walker was willing to conspire with an inmate to procure a false confession, the jury might well conclude that the investigation was aimed at convicting LeBere rather than uncovering the truth. It may have questioned what other evidence police ignored, or even whether investigators fabricated other evidence. The government responds that Walker did not conduct the entire investigation, so much of it remains untainted by his actions. But Walker testified that as the lead detective, "all leads" and "information [that] comes in" was referred to him. He described himself as the "pivot point" of the investigation. Showing that Walker encouraged an informant to lie would have had an impact on the case as a whole.

We similarly reject the government's argument that the suppressed evidence is immaterial because the jury likely disbelieved Archuleta anyway. The jury acquitted LeBere of felony murder and murder after deliberation. Archuleta's testimony was the only evidence directly indicating that LeBere was guilty of those charges. But

10

even assuming that the jury did not believe Archuleta, the suppressed evidence would have done far more than impeach him: it could have caused the jury to question the entire investigation.

This is not to say that the undisputed evidence is insufficient to support the verdict. There appears to be no dispute that LeBere left a bar with Richards before the murder, was present in her van, and was near the scene of the crime shortly after her death. LeBere's story when interviewed by police was not entirely consistent. And he had a haircut the day after the murder, which could indicate an attempt to evade identification. But the materiality inquiry must not be confused with a test of the sufficiency of the evidence. Kyles, 514 U.S. at 434.

Although there was substantial circumstantial evidence of guilt, other evidence in the record raises doubts. Two homeless men were also near the scene of the crime but were not investigated. An eyewitness saw a man standing near Richards' van just before the fire who did not match LeBere's description. And Herring, who admitted to abusing Richards, may have lied to police about staying home the night of the murder. The suppressed evidence fits neatly with LeBere's theory that law enforcement prematurely concluded that he was guilty rather than investigating other available leads. When coupled with the suppressed evidence, this information could have prompted the jury to reasonably doubt LeBere's guilt. We conclude that the suppressed evidence is sufficient to undermine our confidence in the verdict. See id.

**III**

11

The government spends most of its brief arguing that we should affirm on the alternative ground that Archuleta's recantation was not credible. We decline to do so. "The evaluation of credibility is not a function for the appellate court." United States v. Miller, 460 F.2d 582, 587 (10th Cir. 1972). Although the magistrate judge recommended that the district court reject Archuleta's recantation as not credible, the district court denied relief on different grounds. We sit in review of the district court's decision, not the magistrate judge's recommendation. See Colo. Bldg. & Constr. Trades Council v. B.B. Andersen Constr. Co., 879 F.2d 809, 811 (10th Cir. 1989).

Accordingly, we leave it to the district court on remand to consider credibility in the first instance. On remand, the district court may adopt a magistrate judge's credibility finding, or if it concludes that an evidentiary hearing is appropriate, conduct a hearing and observe the witnesses independently. See Wildermuth v. Furlong, 147 F.3d 1234, 1236 (10th Cir. 1998); United States v. Orrego-Fernandez, 78 F.3d 1497, 1501 (10th Cir. 1996).

## IV

For the foregoing reasons, we **REVERSE** and **REMAND** for further proceedings.

Entered for the Court

Carlos F. Lucero
Circuit Judge

12

No. 16-1499, <u>LeBere v. Trani</u>

**BRISCOE**, Circuit Judge, dissenting.

I respectfully dissent.  In my view, the district court correctly denied LeBere's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  I therefore vote to affirm.

I

A

On October 20, 1998, LeBere was charged by information in the District Court of El Paso County, Colorado, with three counts of murder in the first degree and one count of second degree arson.  Count One charged him with deliberately and intentionally causing the death of Linda Richards, in violation of Colo. Rev. Stat. § 18-3-102(1)(a).  Counts Two and Three charged LeBere with killing Richards in the course of committing arson and sexual assault, in violation of Colo. Rev. Stat. § 18-3-102(1)(b).  Lastly, Count Four charged LeBere with second-degree arson in connection with the burning of Richard's van.

The case proceeded to trial in August 1999.  The circumstantial evidence of LeBere's involvement in Richards' death and the burning of her van was substantial, if not overwhelming.  Specifically, the circumstantial evidence established the following:

· at approximately 9:00 p.m. on the evening of October 15, 1998, Richards entered a bar named Crazy Mike's, located on the east side of Colorado Springs, and proceeded to sit and drink;

· LeBere, who had been playing pool in the bar, approached Richards at the bar, sat down, and began talking to her;

· Richards and LeBere spent the next several hours drinking together at the bar;

· a bartender asked LeBere if he was "gonna get lucky," and LeBere responded that he and Richards had talked about a "one night stand," but that Richards did not believe in one night stands;

· Richards and LeBere left the bar together at approximately 12:30 a.m. on October 16, 1998;

· although LeBere had previously told the bartender that he was going to walk home, he told the bartender as he was leaving that Richards was going to give him a ride home;

· according to the pathologist who performed the autopsy, Richards was manually strangled at some point between 12:30 a.m. and 2:00 a.m. on October 16, 1998;

· at approximately 2:15 a.m. on October 16, 1998, a woman who lived on the west side of Colorado Springs heard a car horn steadily blaring from the direction of a nearby car wash; the woman then observed LeBere walking away from the car wash and towards a 7-Eleven convenience store;

· at approximately 2:30 a.m. on October 16, 1998, Richards' van was observed to be on fire at that same car wash;

· after firefighters extinguished the fire, they found Richards' partially-clothed body wedged between the two front seats of the van;

· at approximately 2:35 a.m. on October 16, 1998, LeBere was videotaped on a surveillance camera inside of the 7-Eleven store;

· between 2:45 a.m. and 3:00 a.m. on October 16, 1998, a cab driver picked LeBere up outside the 7-Eleven store;

· the cab driver described LeBere as "very nervous" and indecisive about where he wanted to be dropped off at;

· the cab driver ultimately dropped LeBere off a short distance from LeBere's residence;

· LeBere's aunt, with whom LeBere lived, observed LeBere arrive home shortly after 3:00 a.m. on October 16, 1998;

3

· LeBere told his aunt that he had been at Crazy Mike's with a woman, had

left with the woman in her van to go to another bar, but became sick,

decided he needed to go home, and then walked around until he found a 7-

Eleven store and called a taxi for a ride home;

· midday on October 16, 1998, LeBere visited a barber and had his hair cut

significantly shorter;

· when questioned by the police, LeBere first told them that he had walked

home from Crazy Mike's alone; LeBere then changed his story and told the

police that he left the bar with Richards at approximately 1:30 a.m. and that

she drove him to his residence.

To prove that LeBere killed Richards intentionally or in the course of committing

another felony (sexual assault or arson), the prosecution also presented testimony from

Ronnie Archuleta, an inmate who had been housed with LeBere shortly after his arrest.

Archuleta testified that LeBere admitted to him that he had raped Richards, strangled her

to death, and burned her van to conceal the evidence. According to Archuleta, LeBere

said he killed Richards so she would not be able to identify him from a phoenix tattoo on

his arm.

LeBere's defense strategy focused, in part, on challenging Archuleta's credibility.

As the district court noted, "[t]he jury learned that . . . Archuleta had been convicted of

fraud, forgery, and criminal impersonation." Aplt. App. at 129. "He admitted that he

was in danger of being prosecuted as a habitual offender, which would likely result in him spending up to eighteen years in prison, and that he was testifying against . . . LeBere to avoid it and to receive favorable treatment from prosecutors." Id. "Witnesses testified that . . . Archuleta [wa]s a chronic liar." Id. In particular, "[a] former deputy police chief testified that after . . . Archuleta had worked as a confidential informant, the Colorado Springs vice and narcotics unit decided to stop using him because he made a false report, was unreliable, and did not tell the truth." Id. "LeBere also showed that . . . Archuleta could have gleaned the information he testified to from local newspaper reports that predated . . . LeBere's alleged confession." Id.

LeBere's attacks on Archuleta's credibility proved successful. The jury convicted LeBere only of second-degree murder and second-degree arson, and acquitted him on the various first-degree murder counts.

B

LeBere exhausted his state court remedies and now seeks federal habeas relief from his convictions. At issue is LeBere's claim that the prosecutors in his case "relied on perjured testimony" from Archuleta "and withheld potentially exculpatory evidence material to his defense," i.e., evidence that lead detective J.D. Walker assisted Archuleta in concocting a false confession story, "in violation of Brady v. Maryland, 373 U.S. 83 (1963)." LeBere v. Abbott, 732 F.3d 1224, 1225 (10th Cir. 2013). LeBere's claim rests entirely on Archuleta's post-trial recantation of his trial testimony.

5

The magistrate judge issued a report and recommendation recommending that LeBere's petition be denied. In doing so, the magistrate judge made extensive findings of fact based on the evidence in the record, including videotaped depositions of Archuleta and Walker that were taken during discovery in the federal habeas proceedings. The magistrate judge noted "that the ultimate resolution of [LeBere's] Brady claim turn[ed] on the relative credibility of Archuleta and Walker" because "[i]t [wa]s readily apparent based on their conflicting deposition testimony . . . that they [could not] both be telling the truth about [LeBere's] jailhouse confession and their own trial testimony." Aplt. App. at 86–87. The magistrate judge ultimately found "that the preponderance of the evidence demonstrate[d] Walker's testimony [wa]s credible and Archuleta's recantation [wa]s not." Id. at 92. For that reason, the magistrate judge "[wa]s not persuaded that the prosecution either relied on perjured testimony from Archuleta and Walker or that Walker met with Archuleta and provided him information enabling Archuleta to give false testimony." Id.

LeBere filed written objections to the report and recommendation. After considering his objections, the district court issued an order adopting the magistrate judge's recommendation to deny LeBere's petition for federal habeas relief. The district court did not resolve LeBere's Brady claim on the basis of the respective credibility of Walker and Archuleta. Aplt. App. at 122. Instead, the district court "assume[d] that Colorado suppressed the impeachment evidence," and in turn concluded that the jury's verdict was not dependent upon Archuleta's testimony and that the impeachment

6

evidence was not necessary to raise doubt as to the veracity of Archuleta's testimony.  Id. at 123.  In other words, the district court concluded that "the verdict [wa]s sufficiently supported by evidence other than . . . Archuleta's testimony, and . . . that the jury [apparently] did not find his testimony to be credible in significant respects."[1]  Id. at 129.  Accordingly, the district court concluded "that the suppression of the impeachment evidence did not result in a denial of due process to . . . LeBere."  Id.

II

A

LeBere argues on appeal that "the District Court erred when it found that [he] could not maintain a Brady claim based on the State's presentation of perjured testimony and that any suppression of evidence by the State was not material to LeBere's conviction."  Aplt. Br. at 35.  Because LeBere's Brady claim was not decided on the merits in state court, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error.  Underwood v. Royal, 894 F.3d 1154, 1162 (10th Cir. 2018).

In Brady, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Evidence qualifies as material and must be disclosed by

---

[1] Ironically, both the state trial court and the Colorado Court of Appeals reached the same conclusion when LeBere moved for a new trial on the basis of Archuleta's recantation.

the prosecution under <u>Brady</u> when there is "any reasonable likelihood" it could have "affected the judgment of the jury." <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972) (quoting <u>Napue v. Illinois</u>, 360 U.S. 264, 271 (1959)). To prevail on a <u>Brady</u> claim, a petitioner need not show that it is "more likely than not" that he would have been acquitted had the new evidence been admitted. <u>Smith v. Cain</u>, 565 U.S. 73, 75 (2012) (internal quotation marks omitted). Instead, the petitioner must show only that the new evidence is sufficient to "undermine confidence" in the verdict. <u>Id.</u> (internal quotation marks and brackets omitted).

The rule announced in <u>Brady</u> applies to evidence that undermines the credibility of a witness. <u>Giglio</u>, 405 U.S. at 153–54. But, that said, "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." <u>Smith</u>, 565 U.S. at 76.

Finally, the Supreme Court has emphasized that "[r]ecantation testimony is properly viewed with great suspicion." <u>Dobbert v. Wainwright</u>, 468 U.S. 1231, 1233 (1984). "It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach the cumulative evidence rather than to undermine confidence in the accuracy of the conviction." <u>Id.</u> at 1233–34.

8

B

In addressing LeBere's Brady claim, the majority takes the same approach as the district court and assumes both that Archuleta's recantation is truthful, and that the prosecution in LeBere's case suppressed impeaching evidence. But the majority disagrees with the district court regarding the merits of Archuleta's Brady claim and "conclude[s] that the suppressed evidence is sufficient to undermine [its] confidence in the verdict." O&J at 11. Although the majority concedes that "there was substantial circumstantial evidence of guilt," it concludes that "[t]he suppressed evidence fits neatly with LeBere's theory that law enforcement prematurely concluded that he was guilty rather than investigating other available leads." Id. On that point, the majority emphasizes that Walker was the lead detective and served as the self-described "'pivot point' of the investigation." Id. at 10. The majority further concludes that, "[w]hen coupled with the suppressed evidence," information presented by LeBere at trial regarding other possible suspects "could have prompted the jury to reasonably doubt LeBere's guilt." Id. at 11.

I strongly disagree. In my view, the majority's analysis overemphasizes both Walker's importance to the prosecution's case against LeBere and the strength of the "other possible suspect" information that LeBere presented. It is undisputed that Walker was the lead detective in the case. But Walker played a very minor role at trial. He testified about responding to the scene of the burning van, described the condition of Richards' body in the van, and explained how he learned about LeBere's confession to

9

Archuleta. The majority makes much of the fact that Walker was the self-described "pivot point" in the investigation and all information supposedly "referred to" Walker. But there is no evidence—nor even a suggestion—that Walker tampered with or altered the mountain of circumstantial evidence that the prosecution presented at trial. Indeed, much of that circumstantial evidence came from eyewitness testimony and was essentially undisputed.

Even if we assume that Walker persuaded Archuleta to testify falsely at trial regarding LeBere's purported confession, had that information been presented to the jury, it would not have altered the above-described circumstantial evidence. Moreover, even without the purported <u>Brady</u> evidence, it is apparent from the verdict that the jury rejected Archuleta's testimony regarding LeBere's alleged confession. Had the jury heard testimony from Archuleta that Walker persuaded him to lie about LeBere's alleged confession, the jury almost certainly would have also rejected that testimony as lacking credibility. In other words, there is no reasonable basis to conclude that the jury would have believed anything that Archuleta said, having heard all of the evidence undermining his credibility.

The majority asserts that "even assuming that the jury did not believe Archuleta, the suppressed evidence would have done far more than impeach him: it could have caused the jury to question the entire investigation." <u>Id.</u> at 10. There are two problems with that assertion. First, it assumes that the jury would have believed Archuleta's recantation testimony and his story about how Walker persuaded him to lie. As noted,

10

that is a doubtful proposition. Second, the majority fails to identify which, if any, of the multiple items of circumstantial evidence it believes would reasonably have been called into question by the purported impeachment evidence. As I have explained, none of that evidence would have reasonably been called into question.

The only other rationale offered by the majority for its conclusion is that the suppressed impeachment evidence might "have prompted the jury to reasonably doubt LeBere's guilt" when considered in light of LeBere's attempts to cast blame on other individuals. Id. at 11. But a review of the record reveals that, despite the best efforts of LeBere's trial counsel, there was scant evidence suggesting that anyone other than LeBere was involved in Richards' murder. Although LeBere's counsel attempted to cast blame on Richards' fiancé, Russell Herring, there was no direct or circumstantial evidence linking Herring to the murder or otherwise calling into question LeBere's involvement in the murder. Curiously, the majority states that Herring "may have lied to police about staying home the night of the murder." Id. Even if that dubious proposition were true, there was no other evidence even remotely linking him to Richards' murder. Likewise, the majority notes that "[t]wo homeless men were . . . near the scene of the crime but were not investigated," and "[a]n eyewitness saw a man standing near Richards' van just before the fire who did not match LeBere's description." Id. Again, these minor pieces of evidence do little or nothing to undermine the overwhelming circumstantial evidence of LeBere's guilt.

11

For these reasons, I agree with the district court that LeBere's <u>Brady</u> claim—which is based exclusively on the post-trial recantation of a witness whose trial testimony the jury rejected as lacking credibility—is meritless and does not justify the grant of federal habeas relief.